**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.**

v.

**TENNESSEE VALLEY AUTHOR-ITY et al.**

Civ. A. No. 8062.

United States District Court,
E. D. Tennessee, N. D.

April 17, 1973.

Charles D. Susano, Jr., Knoxville, Tenn., Richard M. Hall, New York City, William A. Butler, East Setaukey, N. Y., Stephen C. Cawood, Barbourville, Ky., for plaintiffs.

Robert Young, Robert H. Marquis, TVA Gen. Counsel, Thomas A. Pedersen, L. Gray Geddie, Jr., Knoxville, Tenn., Holliman Langholz, Runnels & Dorwart, C. D. McDoulette, Jr., Tulsa, Okl., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action was commenced by six conservation organizations seeking declaratory and injunctive relief requiring T.V.A. to comply with the National Environmental Policy Act of 1969.[1] The

---

1. 42 U.S.C. § 4321 et seq. (1970) (hereafter cited as NEPA).

parties have agreed that plaintiffs' motion for a preliminary injunction and/or partial summary judgment relates only to the issue of whether § 102(2)(C) of NEPA requires that T.V.A. file an impact statement for each of the three long-term coal contracts in force between T.V.A. and the other defendants. Related to this is the question of whether T.V.A.'s regulations holding that such impact statements are not required are valid under NEPA.[2]

T.V.A. has the largest power system in the nation. It ordinarily supplies electrical power to an 80,000 square mile area. In order to meet the demands of consumers, T.V.A. has, in addition to hydroelectric plants, twelve coal-fired steam plants. These plants generate approximately 80% of T.V.A.'s electrical power.

In fiscal year 1971, 32.5 million tons of coal were used to supply these steam plants. Fifty-nine per cent of this coal came from surface mines; the remainder from underground coal mines. Since January 1, 1970, the date NEPA became effective, T.V.A. has entered into 106 long-term coal contracts to obtain sufficient coal to operate these coal-fired plants.[3]

There are three types of contracts used by T.V.A. in procuring coal: spot, emergency and term. Spot contracts are for a period of four weeks or less. Emergency contracts are generally for periods up to six months, and term contracts must be for a minimum of six months and must require a production level of not less than 500 tons per week and a total purchase of at least 25,000 tons. The three contracts involved in this action are term contracts. The contract between H & B Mining Company and T.V.A. provided for a weekly tonnage base of 2,500 tons and is to be in force from December 10, 1970, through December 13, 1973. Falcon Coal Company, successor to Kentucky Oak Mining Company, has a contract with T.V.A. to provide a base weekly tonnage of 50,000 tons of coal from July 1, 1970, and to continue through June 30, 1975. This contract was renegotiated in April of 1972 and is for the same tonnage but extended the termination date until March 29, 1981.[4] Long Pit Mining Company, a division of A. B. Long, Inc., has in force with T.V.A. a contract and lease which requires defendant Long to provide and T.V.A. to purchase 10,000 tons of coal per week from December 1, 1971, through approximately March 1975. The estimated value of this contract is $10,920,000.[5] The coal supplied

2. The only remaining issue presented in plaintiffs' complaint is whether the environmental impact statement filed by T.V.A. in February 1971, dealing with the coal procurement policies of T.V.A. is adequate under NEPA.

3. Testimony at the hearing of this case showed that over 2,000 total contracts for coal have been entered into between T.V.A. and various coal companies since NEPA became effective. The figure of 106 term contracts was presented by T.V.A. Since it is plaintiffs' position that a natural or convenient dividing point between a major and non-major federal action, as this relates to T.V.A.'s coal purchasing program, is the term contract; and the number of such contracts bears on the question of how "major" they are, we asked plaintiffs to submit their findings on the number of contracts entered into by T.V.A. In a memorandum letter plaintiffs found that T.V.A. has sixty outstanding term contracts. Thirty-two of these are for coal produced from deep mines, and twenty-eight for coal from surface mines. Only twenty-three of these twenty-eight, plaintiffs state, would arguably be covered by NEPA. The remaining five being pre-NEPA contracts. Plaintiffs add that this number could further decrease due to the fact that many of these contracts are near termination dates and impact statements would be futile. Of course, under this theory any new term contracts would be covered by NEPA and impact statements would be required.

4. It has consistently been defendant Falcon's position that the contract that it has between itself and T.V.A. was executed prior to January 1, 1970, and therefore not covered by NEPA. Since we hold as we do, we need not pass on this issue.

5. Plaintiffs at the hearing moved to dismiss against defendant W. B. Spradlin Coal Company and the motion was granted.

by each of these contracts will come from surface mines.

Section 102(2)(C) of NEPA provides in part that:

The Congress authorizes and directs that, *to the fullest extent possible* . . . all agencies of the Federal Government *shall* . . . include in every recommendation or report on proposals for legislation and other *major Federal actions significantly affecting the quality of the human environment,* a detailed statement . . . (Emphasis Added)[6]

In November of 1971 T.V.A.'s Board of Directors passed the following resolution:

"WHEREAS the Board has made the following determinations concerning T.V.A.'s compliance with Section 102(2)(c)[C] of the National Environmental Policy Act as it relates to T.V.A. coal policies:

That individual procurement actions are not within the scope of Section 102(2)(c)[C] of the National Environmental Policy Act;

That individual coal procurement actions are incremental actions in furtherance of commitments to a program of coal-fired generation on the T.V.A. system, all of which commitments were made prior to the passage of the National Environmental Policy Act;

That if individual procurement actions were within the scope of Section 102(2)(c) [C], the requirements of that section would conflict with the competitive bidding requirements of Section 9(b) of the T.V.A. Act, since competitive bidding as required by Section 9(b) would be severely restricted or rendered impossible by the Section 102 (2)(c) [C] procedure if applied to individual coal procurement actions,

That any requirements of Section 102(2)(c) [C], which are applicable to coal procurement, will be met

through the filing of a comprehensive statement dealing with TVA policies, with supplements as appropriate . . . ."

In December of this same year T.V.A. published in the Federal Register its "Environmental Quality Management, Policy, Delegations, Reservations, and Procedures." [7] Consistent with the resolution passed by the Board these regulations defined "actions" in such a manner as to lump all of T.V.A.'s coal procurement contracts under a single classification and thus avoid the filing of multiple impact statements. It is these regulations that plaintiffs attack as being illegal under NEPA.

In 1971 T.V.A. filed an environmental impact statement entitled "Policies Relating to Sources of Coal Used by the Tennessee Valley Authority for Electric Power Generation". This statement dealt with the problems of strip mining as well as deep coal mining. T.V.A.'s policies on reclamation and conservation were set forth including the 1971 mandatory contract provisions. This statement was filed to cover all of the present and future actions by T.V.A. dealing with coal procurement.

■ At the outset we must decide what significance to attach to the determination made by the Board of Directors of T.V.A. that the filing of individual impact statements for each term coal contract would result in a conflict with § 9 of the T.V.A. Act. The plaintiffs see the issue before this Court as purely a question of law. They state that what T.V.A. has determined is that " . . . no coal contract may be a major federal action significantly effecting the quality of the human Environment." As such, plaintiffs argue that the case presents a question of statutory construction that should be decided by this Court. See, Natural Resources Defense, Inc. v. Grant, 341 F.Supp. 356 (E.D.N.C.1972); Scherr v. Volpe, 336 F.Supp. 886 (W.D. Wis.1971). Were we inclined to accept counsel's statement of the issue present-

---

6. Title 42 U.S.C. § 4332.

7. 36 Fed.Reg. 21010 (1971)

ed at the hearing, namely, whether these coal contracts are major actions, we would agree with his conclusion as to the scope of review. However, as we read the record, the determination made by T.V.A. was not solely that these contracts were or were not major actions but that Section 9(b) of the T.V.A. Act required a reconciliation of the two statutory provisions. In order to avoid a possible conflict between NEPA and Section 9(b), T.V.A. determined that the filing of a single program statement covering its entire policy of procurement of coal would satisfy the mandate of NEPA. Therefore, this was, as plaintiffs argue, T.V.A.'s determination of what constituted the major action, but it was prompted by the apparent conflict between the two Acts. Thus, what is presented is a question of mixed law and fact and as such we use the rational basis test to review the T.V.A. determination. See, Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Me.1972); See generally, Hanley v. Kleindienst, 471 F.2d 823 (2d Cir. 1972).

■ The phrase in § 102 of the NEPA that "Congress authorizes and directs that, to the fullest extent possible . . . " has been consistently construed to require compliance with NEPA unless compliance would give rise to a violation of other statutory authority under which the agency is proceeding. See, EDF v. TVA, 468 F.2d 1164 (6th Cir. 1972); Alabama Gas v. Federal Power Comm'n, 476 F.2d 142 (5th Cir. 1973); Calvert Cliff's Coord. Comm'n. v. United States Atomic Energy Comm'n., 449 F.2d 1109, 1114–1115 (D. C. Cir. 1971).

Lynn Seeber, General Manager of T. V.A. and the official charged with seeing that NEPA is complied with, outlined in his affidavit the process involved in preparing and filing an impact statement. Initially, research is required in order to assemble the data from which a proposed draft is made. Once completed the proposed draft is circulated throughout the agency for suggestions and comments. Once these are processed, the final draft is prepared.

The final draft is then printed and copies are sent to interested state, local, and federal agencies. Notification is also given to the public via the news media and notice in the Federal Register. After the comments from these areas are received they are sent to specialists for further examination. At this point, additional environmental studies or research may be necessary.

Finally, a proposed final statement is prepared. After a recirculation of the draft throughout the agency, Mr. Seeber reviews the statement and discusses it with the Board of Directors. This final statement is then filed with C.E.Q. In all, this complete procedure takes between six months to a year.

It was found by the T.V.A. Board of Directors that to follow this process with each individual term coal contract would conflict with Section 9(b) of the T.V.A. Act.[8] Section 9(b) provides in part that:

"All purchases and contracts for supplies or services, except for personal services, made by the Corporation, shall be made after advertising, in such manner and at such times sufficiently in advance of opening bids, as the Board shall determine to be adequate to insure notice and opportunity for competition . . ."

Prices in the coal market fluctuate greatly. Presently a bidder on a T.V.A. coal contract must hold his reserves dedicated to his bid for a period of 120 to 150 days. Other coal purchasers do not have this waiting period and deliveries can be commenced within days after the bid is submitted (See, Statement of Counsel Robert S. Young, pg. 1).[9] If an additional six months to one year were

---

8. Title 16 U.S.C. § 831h(b)

9. The parties agreed to treat the affidavits and statements of counsel as testimony in this action. If a disputed point arose, either side had the right to call witnesses if desired.

added to this processing time in order to file impact statements, few, if any, coal companies would bid on T.V.A. term coal contracts. Assuming there were to be bidders, they would most certainly be the larger coal companies who would be financially able to weather this extended processing time on the hope that they may be awarded the T.V.A. contract.[10] We cannot say that there is no rational basis for T.V.A.'s finding that a situation such as this would lead to a conflict with section 9(b) of the T.V.A. Act.

Additionally, we note that the Council on Environmental Quality [11] was aware of T.V.A.'s position on filing a single program statement and tacitly approved of the procedure, or at least did not object.

Particularly important in relation to this is the letter of September 9, 1971, from Mr. Atkeson, General Counsel for CEQ, to the Audubon Society.

Mr. Atkeson stated that:

"A question of this nature has arisen with respect to a number of programs administered by various Federal agencies: Where a program consists of a large number of individual actions, taken in accordance with uniform policies, can Section 102(2)(C) be implemented more effectively by the preparation of separate environmental impact statements on the individual actions or a single statement on the program as a whole? In some instances the single, overall environmental statement will be preferable, because it will permit avoidance of duplication, ensure consideration of cumulative effects, and make possible a more exhaustive examination of effects and alternatives than would be possible in an environmental statement on each individual action. *The Tennessee Valley Authority's coal-pur-chasing policies may be an instance in which all of these considerations support the preparation of an overall statement.* (Emphasis Added)

"However, this does not mean that Section 102(2)(C) is satisfied if such a statement is superficial or limited to generalities. The very rationale for an overall statement requires that environmental effects be cataloged in detail and all reasonable alternatives explored. Where the effects or alternatives are different for different actions covered by the overall statement, those effects or alternatives must be considered separately in the statement. In short, the overall statement provides an opportunity to make the analysis of environmental issues more complete, not less rigorous. In addition, an overall environmental impact statement must be supplemented or updated as necessary to account for changes in the Federal program and to measure cumulative impacts over time."[12]

Plaintiffs argue that viewing this letter as a whole it cannot fairly be regarded as CEQ approval. They also contend that the official position of CEQ is embodied in the recommendations filed May 16, 1972, and that these conflict with the letter by Mr. Atkeson.[13] We disagree. A fair reading of this letter certainly gives the impression that CEQ has accepted the procedure of a single program statement for T.V.A.'s coal purchases. The recommendations adopted in May of 1972 rather than conflicting with Mr. Atkeson's letter actually reiterates the ideas developed in the correspondence.

Section 5 of these recommendations states, in part, that:

"Individual actions that are related either geographically or as logical parts

---

10. Falcon Coal Company, one of the larger coal companies bidding on T.V.A. contracts, stated that they would not bid on a T.V.A. term contract under the conditions outlined above. See, Statement of Counsel, C.D. McDoulett, Jr., pg. 3.

11. Under NEPA the reviewing agency is the Council on Environmental Quality.

12. A copy of this letter was forwarded to T.V.A. by Mr. Atkeson.

13. 102 Monitor Vol. 2, No. 5, pg. 18, June, 1972.

in a chain of contemplated actions may be more appropriately evaluated in a single, program statement. Such a statement also appears appropriate in connection with the issuance of rules, regulations, or other general criteria to govern the conduct of a continuing program, or in the development of a new program that contemplates a number of subsequent actions. Examples of such program statements include the Interior Department's statements on its oil shale program and on its exploitation of Geothermal steam under the Geothermal Steam Act of 1970. In all of these cases, the program statement has a number of advantages. It provides an occasion for a more exhaustive consideration of effects and alternatives that would be practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basis policy questions. The program statement can, of course, be supplemented or updated as necessary to account for changes in circumstances or public policy and to measure cumulative impacts over time."

"A program statement will not satisfy the requirements of Section 102, however, if it is superficial or limited to generalities. Where all significant issues cannot be anticipated or adequately treated in connection with the program as a whole, statements of more limited scope will be necessary on subsequent, individual actions in order to complete the analysis."

In these recommendations the same criteria or considerations for determining when a program statement is more functional than individual impact statements is followed as in the letter by Mr. Atkeson. These criteria are duplication, development of cumulative effects, and more exhaustive consideration of the program. These considerations are certainly applicable to T.V.A.'s policies on procurement of coal. There have been numerous term contracts entered into since the passage of NEPA. Assuming each of these would require a separate impact statement, there would be a deluge of impact statements. It is exactly this type of situation that CEQ has attempted to avoid.[14]

Plaintiffs emphasize the concluding paragraph of the recommendations to establish that an additional statement is necessary to complete the analysis of the effect of T.V.A.'s coal purchases. They argue that the general approach of a single program statement is not realistic in view of the multitude of environmental problems involved in each mine. Affidavits submitted by plaintiffs assert that the impact of a particular mine varies depending, for instance on the slope, its proximity to water, highways, and houses. A strip mine on a mountainside facing a state park, they state, has a far different effect than a mine in a remote region far removed from any scenic area. Plaintiffs concede that the program statement already filed by T.V.A. gives some recognition to these variables. However, they argue, that T.V.A. by filing this single overall statement will never have to publicly focus on the hard specifics of a given mine.

In the program statement filed, T.V.A. has attempted to delineate the recurring problems involved in strip mining. The 1971 mandatory contract provisions require mining companies to submit a pre-mining report prior to the time T.V.A. awards its contract. These pre-mining reports must map common environmental problems such as acids, slides, erosion, aesthetics, etc., involved in the particular area that is to be mined to

---

14. "In particular we are interested in finding ways of consolidating numbers of impact statements into fewer but broader and more meaningful reviews." Recommendations for improving Agency NEPA Procedures, pg. 1, May 16, 1972. 102 Monitor, Vol. 2, No. 5, pg. 1, June 1972.

satisfy the T.V.A. contract. As we read these mandatory contract provisions, many of the variables used by plaintiffs to illustrate their contention that surface mining involves a multitude of diverse environmental difficulties are actually dealt with by the contract provisions. For example, plaintiffs state that the impact of a particular mine varies depending on the slope. T.V.A. contract provisions, however, prohibit TVA from accepting coal from areas in which the slope of the land exceeds 28°.[15] Likewise, plaintiffs cite proximity to streams and highways as critical to the particular effect of a mine. Again, the provisions of the contract preclude acceptance in areas within 100 feet of a stream [16] and near visually important areas (e. g. highways or population centers).[17] In all, these provisions indicate areas from which T.V.A. will accept coal. These areas are referred to as "mineable areas". Many of the examples forwarded by plaintiffs would fall outside of these "mineable areas". Finally, it is our understanding from testimony given at the hearing that these pre-mining reports are available to the general public.

█ Thus, considering the conflict that exists between § 9(b) of the T.V.A. Act and the possible interpretation of NEPA requiring the filing of individual impact statements for each contract, we hold that there was a rational basis for T.V.A.'s determination that compliance with NEPA could be accomplished by filing a single program statement. It follows from the record as it stands that plaintiffs' motion for partial summary judgment must be, and the same hereby is, denied. Further, plaintiffs' request for the extraordinary remedy of a preliminary injunction must be, and the same hereby is, denied.

15. See, T.V.A. Environmental Impact Statement, pg. A–5.

16. Id. at p. A–2.

17. Id. at p. C–1. If coal is accepted in an area designated as visually important, special provisions for reclamation are incorporated into the procurement contract.