NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Plaintiffs,

v.

Rogers C. B. MORTON et al.,
Defendants.

Civ. A. No. 1983–73.

United States District Court,
District of Columbia.

Dec. 30, 1974.

Edward L. Strohbehn, Jr., Natural Resources Defense Council, Inc., Washington, D. C., John Roger Beers, John E. Bryson, Natural Resources Defense Council, Inc., Palo Alto, Cal., for plaintiffs.

William M. Cohen, U. S. Dept. of Justice, Washington, D. C., James Coda, Attorney-Advisor, U. S. Dept. of the Interior, Washington, D. C., for defendants.

Max Barash, Washington, D. C., Raymond M. Momboisse, Ronald A. Zumbrun, Pacific Legal Foundation, Sacramento, Cal., for intervenor-defendants Pacific Legal Foundation and Public Lands Council, Inc.

## MEMORANDUM OPINION AND JUDGMENT

FLANNERY, District Judge.

### MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment by plaintiffs, federal defendants and defendants-intervenors. It presents important issues concerning the applicability of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (1970), to the livestock grazing permit program of the Bureau of Land Management, United States Department of Interior. Five of the six plaintiffs are environmental organizations whose general objectives are to enhance and protect the environment and to insure proper resource management; the remaining plaintiff is an individual who has specialized in studying bighorn sheep and whose scientific, conservation and esthetic interests are allegedly injured. Defendants-intervenors are non-profit organizations concerned primarily with range management. Plaintiffs satisfy the standards for standing set forth in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and jurisdiction is conferred by 42 U.S.C. § 4321 et seq. (1970).

### The Bureau of Land Management Permit Program

The Bureau of Land Management (BLM) is charged with managing and protecting over 171 million acres of public or national resource lands located in 11 western states.[1] These lands not only contain valuable environmental and recreational resources, but also provide grazing for an estimated 14 percent of all livestock in the United States during some parts of their lives. Livestock operators hold approximately 24,000 BLM licenses, permits, and leases to graze their stock on 150 million of the 171 million acres administered by the Bureau. The issuance and regulation of these licenses constitutes one of the main activities of the BLM. It also carries on activities such as vegetation control and the construction of fences and watering facilities designed to improve grazing and protect the land, and works closely with other federal agencies in such

---

1. Responsibility for these lands is entrusted to the Secretary of the Interior pursuant to the Taylor Grazing Act, 43 U.S.C. § 315 et seq. (1970).

areas as watershed maintenance and soil conservation.

The Bureau's management of the public lands is carried out at three levels or stages of intensity. About 7 million acres are, and will continue to be, managed in a merely custodial fashion due primarily to their scattered and isolated locations. Approximately 108 million acres are administered in a fashion the BLM describes as "the best management attainable within the limits of manpower and funding." It is, however, the goal of the BLM to bring 133 of the 171 million acres of public lands under the third category of management—intensive management—by the year 2000. Currently, however, only 25 million acres (18 percent) are under intensive management.

The 52 BLM grazing districts are the agency's basic management component. The procedures which these districts follow for administering an area under intensive management are rather involved. Each district is divided into planning units and a unit resource analysis (URA) containing a detailed inventory of resources is prepared for each one. After public comment, a land use plan called a management framework plan (MFP) containing a set of "goals, objectives, and constraints" is prepared for each planning unit. Once the MFP is completed, more specialized plans known as program activity plans are prepared for each type of resource-related activity, such as timbering, recreation and grazing, in the unit. An activity plan is designed to lay out in detail how the particular activity will comport with the objectives and constraints of the management plan for that particular unit. The program activity plan for grazing is called an allotment management plan (AMP). A planning unit may contain a number of grazing allotments. It is estimated that the program, continued under present trends, will result in the implementation of 8,230 AMP's (total projected need) by the year 2000.[2] Approximately 1,015 AMP's were implemented prior to July 1973 and another 200 were pending at that time. Before any AMP or other activity plan is implemented it is first determined whether an environmental impact statement is required for the plan. It is against the background that the court must examine the BLM's compliance with NEPA.

*The National Environmental Policy Act*

Section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332 (1970), requires that a detailed environmental impact statement (EIS) be prepared for every major federal action significantly affecting the quality of the human environment. This rather general legislative language has been explained and interpreted in guidelines published by the Council on Environmental Quality (CEQ), the agency established by NEPA to serve as a research, resource, and advisory body to the President. *See* Preparation of Environmental Impact Statements: Guidelines, 40 C.F.R. § 1500 et seq. (1974). The CEQ Guidelines provide that the environmental assessment should be made as early as possible, and in all cases prior to agency decision concerning recommendations or favorable reports on proposals for major federal actions significantly affecting the environment. 40 C.F.R. § 1500.2(a) (1974). These Guidelines apply both to new and continuing projects. *Id.* § 1500.5(2).

The BLM has prepared a draft programmatic EIS for its entire livestock grazing program. *See* Bureau of Land Management, Draft Environmental Impact Statement, Livestock Grazing Management on National Resources Land (March 1974). The BLM contends that this statement will provide an overview of the cumulative impact of the grazing program and will serve as the foundation for subsequent environmental analyses and for supplemental impact state-

2. BLM, Draft Environmental Impact Statement, Livestock Grazing Management on National Resource Lands I–2 (April 1974).

ments which may be prepared for smaller land areas or on an individual basis for specific grazing management actions.[3] The BLM does not indicate, however, under what circumstances it will be necessary to prepare supplemental statements.[4]

Plaintiffs contend that the BLM has failed to comply with the provisions of sub-paragraph (C) of section 102(2) of NEPA in that it has issued and renewed grazing permits in each year from 1970 to the present, and proposes to continue doing so, without preparing an EIS dealing with the actual environmental impact of such actions. Plaintiffs argue that the overall programmatic EIS for grazing does not suffice since it fails to consider the individualized, "on the ground" effects on local environments. They ask that the court declare the actions of the BLM to be violations of NEPA and seek an order establishing a cut-off date for the preparation of appropriate EIS statements. It should be noted that plaintiffs do not seek to enjoin the present issuance of licenses nor do they ask that impact statements be prepared for every license or permit. They ask rather that detailed individual statements be prepared on an appropriate district or geographic level to assess the actual impact of the issuance of federal grazing permits on local environments.

### The Taylor Grazing Act

■ The responses of the federal defendants and the defendants-intervenors differ significantly. Defendants-intervenors argue that NEPA does not require impact statements with regard to the licensing of public lands for grazing since the Taylor Grazing Act, 43 U.S.C. § 315 et seq. (1970), which established the licensing program is an operative and effective method of protecting the environment of the public lands, and to superimpose NEPA on the Taylor Act would substantially interfere with the enforcement of the latter. Defendants-intervenors further argue that the BLM's rules, regulations and administrative procedures protect the environment and should apparently be considered the functional equivalent of an impact statement. As support for this argument they cite Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), in which the Court of Appeals for the District of Columbia partially exempted the Environmental Protection Agency (EPA) from the NEPA requirements. In doing so, however, the court took pains to point out that a very narrow exemption was being established for EPA determinations under section 111 of the Clean Air Act, 42 U.S.C. § 1857c-6 (1970), as amended (Supp. II, 1972). Id. at 387. This exemption clearly does not extend to the Taylor Grazing Act. An analogy of the Taylor Act to NEPA is invalid since the Taylor Act is not purely an environmental act, but was designed both to stop injury to the public domain by unregulated grazing and to promote stabilization of the livestock industry. See LaRue v. Udall, 116 U.S.App.D.C. 396, 324 F.2d 428, 430 (1963), cert. denied, 376 U.S. 907, 84 S.Ct. 660, 11 L.Ed.2d 606 (1967); United States v. Hatahley, 220 F.2d 666, 671 (10th Cir. 1955), modified, 351 U.S. 173, 76 S.Ct. 745, 100 L. Ed. 1065 (1956). To call the Taylor Grazing Act purely environmental is to ignore its language and its history.

### NEPA and the Grazing Program

■ Defendants-intervenors also contend that NEPA does not apply to the BLM licensing program since the program will not significantly affect the quality of the human environment and does not constitute major federal action. However, the statutory phrase "actions

---

3. One such action might be the implementation of an allotment management plan.

4. CEQ Guidelines provide that in a situation in which a programmatic statement is appropriate subsequent statements on major individual actions will be necessary only where such actions have significant environmental impacts not adequately evaluated in the programmatic statement. 40 C.F.R. § 1500.6(d)(1) (1974).

significantly affecting the quality of the environment" is intentionally broad, "reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency." Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1088 (1973). The term "actions" refers not only to actions taken by federal agencies, but also to decisions made by the agencies, such as the decision to grant a license, which allow another party to take an action affecting the environment. *Id.* at 1088–1089; *see* 40 C.F.R. § 1500.5(a)(2) (1974). Whether the granting of a single license requires the filing of an impact statement depends not upon the size of the geographical area affected, but on the nature and severity of the impact. *Cf.* Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973) (construction of federal office building); Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), (construction of federal correctional facility). Grazing clearly may have a severe impact on local environments. Moreover, in some states the BLM administers a huge proportion of the state's acreage. In Nevada, for example, 86 percent of the total area of the state is administered by the BLM [5] and the record illustrates the damage that has occurred there from overgrazing and improper land management. *See generally,* Bureau of Land Management, Effects of Livestock Grazing on Wildlife, Watershed, Recreation and Other Resource Values in Nevada (April 1974). The court is therefore persuaded that the grazing permit program produces significant impacts on individual locales. And when the cumulative impact of the entire program is considered it is difficult to understand how defendants-intervenors can claim either that the impact of the program is not significant or that the federal action involved is not major.[6]

■■ Federal defendants, unlike defendants-intervenors, concede that NEPA applies to the BLM grazing program but argue first that plaintiffs' suit is premature and should await issuance of the final programmatic impact statement,[7] and second that the Bureau is not in violation of the Act since the programmatic impact statement sufficiently complies with the intent of NEPA.[8]

*Exhaustion of Administrative Remedies*

■ Federal defendants urge that plaintiffs' suit is not timely since under the doctrine of exhaustion of administrative remedies the BLM should have

5. Intervenors' Memorandum of Points and Authorities in Support of Motion to Intervene, filed January 2, 1974, at 10. This memorandum indicates that the state with the lowest amount of federal land is Washington, and even there 29 percent of the land area is federal.

6. Defendants-intervenors also argue that the plaintiffs' remedy should be barred by the doctrine of laches. However, the court agrees with Judge Friendly that the "tardiness of the parties in raising the issue cannot excuse compliance with NEPA." City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972) (three-judge court). The primary responsibility for fulfilling the requirements of the Act rests with the agency. *Id.*; Jones v. Lynn, 477 F.2d 885, 892 (1st Cir. 1972); *see* Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118–1119 (1971).

7. Federal defendants also contend that there is no "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704 (1970). The APA, however, specifically provides that the court may compel action which has been unlawfully withheld or unreasonably delayed. *Id.* § 706; *see* Environmental Defense Fund v. Froehlke, 348 F.Supp. 338, 341 (W.D.Mo. 1972), aff'd, 477 F.2d 1033 (8th Cir. 1973).

8. Plaintiffs and federal defendants agree that although NEPA applies to programs which were instituted prior to NEPA with no apparent completion date, it does not require that the program be halted until an EIS is filed. *See* Lee v. Resor, 348 F.Supp. 389 (M.D.Fla.1972); 40 C.F.R. § 1500.5(a)(2) (1974).

an opportunity to prepare an EIS which it believes satisfies NEPA's requirements before plaintiffs may seek court action. In support of this contention federal defendants cite Coalition for Safe Nuclear Power v. AEC, 150 U.S. App.D.C. 118, 463 F.2d 954 (1972), and Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972). In *Coalition for Safe Nuclear Power* the court rejected as premature plaintiffs' request for injunctive relief against construction of a power plant pending full NEPA review. The court indicated that exhaustion of agency proceedings was normally required and remanded for specific hearing by the agency within 60 days. This court agrees with plaintiffs, however, that the case is inapposite, since the AEC provided a specific hearing procedure which does not exist in the present case. *See id.* at 955–956. Moreover, there is merit to the observation of the court in Natural Resources Defense Council, Inc. v. Tennessee Valley Authority, 367 F.Supp. 122 (E.D.Tenn. 1973), that it is doubtful whether there is a true administrative remedy available to private individuals under NEPA. *Id.* at 130–131. The court stated:

"There only exists the right to comment and express one's views, a right which a person always has. We are, therefore, of the opinion that the exhaustion of the administrative remedies doctrine has no application under the facts of this case." *Id.*

*See also* Minnesota Environmental Control Citizens Association v. AEC, 4 ERC 1876, 1878 (D.Minn.1972). The court finds federal defendants' reliance on *Committee to Stop Route 7, supra,* equally misplaced since plaintiffs do not quarrel with the content of the programmatic EIS, nor do they seek to have the court inject itself in its preparation. Plaintiffs instead contend that the proposed statement, even if an excellent programmatic EIS, is insufficient stand-

ing alone. They argue that they need not await a final version of the impact statement since it is not review of the specifics of the final agency programmatic statement which they seek, but a declaration that a programmatic statement does not comply with the law. The court is in agreement with this analysis of the complaint.

Moreover, the rationale of the doctrine of exhaustion of remedies is to allow the agency time to complete its assigned duties before judicial intervention is countenanced. The Court of Appeals for this Circuit, in considering the relation of the notice provision of the Federal Water Pollution Control Act [9] to the requirement of exhaustion of administrative remedies stated:

"Sound discretion bids a court stay its hand upon petition by the Administrator where there is reason to believe that further agency consideration may resolve the dispute and obviate the need for further judicial action. However, . . . the court may promptly proceed to the merits of the action when it is confident or becomes confident that agency recourse is futile, as where the agency's position is firm." Natural Resources Defense Council v. Train, 510 F.2d 692 (D.C. Cir., 1974).

This court might be less willing to consider the plaintiffs' claims if the BLM had demonstrated more diligence in pursuing its own role. The Bureau did not determine to prepare a programmatic EIS on the grazing program until June, 1972, two and one-half years after the effective date of the Act.[10] A preliminary draft was not then issued until March 1973, with a second draft in October 1973. In March 1974 the final draft was prepared and the federal defendants represented to the court that the final EIS was expected to be issued in the summer of 1974. Although the

9. 33 U.S.C. § 1365(b)(2) (Supp. II, 1972). This section requires notice to the agency before commencing a civil suit to enforce provisions of the Act.

10. BLM procedures for implementing the policy and directives of NEPA were published in July 1972. *See* 37 Fed.Reg. 15015 (1972).

court would naturally prefer to await the filing of the final statement, it is clear that the BLM has delayed beyond reason. Indeed, in Natural Resources Defense Council v. TVA, *supra,* the entire process of preparing the programmatic EIS, from initiation of research to issuance of the final statement, appears to have taken only six months. 367 F.Supp. at 131. It should be noted that the only apparent step left in the approval of the draft impact statement is the incorporation of public comments received after publication in the Federal Register.[11] Even in the unlikely event that significant alterations were made in the final statement, the agency has shown no willingness to alter the statement's format as a strictly programmatic assessment. Thus the eventual EIS will not be geographically individualized and its ultimate adoption will have no effect on plaintiffs' current suit.[12]

One other factor has persuaded the court to reach the merits of this claim. Over the past four years the BLM has shown relatively slow progress in implementing a thorough management planning system which would assist in protecting the environment. As noted above, the BLM estimated that 8,320 AMP's are needed. Only 1,015 plans were implemented through fiscal year 1973, and completion of all AMP's is not estimated until the year 2000. Thus, in a substantial and practical sense there is a serious threat of injury to the public lands which lends urgency to plaintiffs' claims. While the court should always be reluctant to rule on issues before full and final agency determination, to wait until the filing of the final programmatic EIS would be a useless act and would thwart Congressional intent, reducing NEPA to a mere "paper tiger." Having

considered the above, it appears to the court that there are no appropriate agency procedures which plaintiffs should be required to exhaust and that the situation dictates a decision by this court on the merits of the claim.

*BLM's Programmatic Impact Statement*

Section 102 of NEPA provides in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations; . . . " 42 U.S.C. § 4332 (1970).

Section 102 then establishes the requirement that impact statements be filed in all major federal actions significantly affecting the human environment. Thus NEPA makes environmental protection part of the mandate of every federal agency, compelling them to consider environmental issues just as they consider other matters within their mandates. *See* Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971). The courts have followed a strict interpretation of these provisions in a number of cases despite weighty counter-considerations.

---

11. Notice of availability of the draft was published April 16, 1974. *See* 39 Fed.Reg. 13697 (1974). The comment period was extended to July 16, 1974. *See id.* 22169.

12. The doctrine of exhaustion of remedies is closely related to the doctrine of primary jurisdiction which is generally applied to in-

sure uniformity of treatment and regulation. The application of the latter and the granting of a stay pending administrative action rest in the sound discretion of the court considering all facts and circumstances presented to it. Ratner v. Chemical Bank New York Trust Co., 309 F.Supp. 983 (S. D.N.Y.1970).

In Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), the District of Columbia Circuit upheld an injunction of oil and gas leases on the continental shelf off of Louisiana despite the profound national energy crisis and although the shelf was an established prolific source. *Id.* at 831. In another case, involving the nation's helium reserve program, NEPA was held by the court to be "nothing less than a mandate to the Secretary in the case at bar, to either follow the prescribed procedure in taking the relevant action or to show that it is not 'possible' within the meaning of the NEPA." National Helium Corp. v. Morton, 326 F. Supp. 151, 156 (D.Kan.), aff'd 455 F.2d 650 (10th Cir. 1971). And in Calvert Cliffs' Coordinating Committee v. AEC, *supra,* the District of Columbia Circuit noted that the spectre of a national power crisis must not be used to create a blackout of environmental considerations in the agency review process. 449 F.2d at 1122. The court in *Calvert Cliffs'* discussed the NEPA requirements and stated that:

"the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of statutory authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance." 449 F.2d at 1115 (citation omitted).

The court thus underscored the rigor with which the NEPA requirements must be applied and the importance of adhering to a strict interpretation to these provisions, further stating:

"Our duty, in short, is to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." 449 F.2d at 1111.

This court is therefore constrained to follow the requirements of NEPA to the maximum extent possible.

The court has examined the cases cited by the parties, especially Natural Resources Defense Council v. TVA, *supra,* on which federal defendants rely to establish the appropriateness and sufficiency of their programmatic statement. In that case defendant TVA purchased coal under contracts of various lengths to supply TVA generating facilities. Defendant TVA completed an EIS which examined the policies involved in selecting coal sources and weighed the problems of strip versus deep coal mining. This EIS was filed to cover all of the present and future actions by TVA dealing with coal procurement; TVA did not prepare impact statements for individual contracts. The court, after careful scrutiny of the EIS and of the provisions of section 9(b) of the TVA Act [13] requiring competitive bidding on all contracts, determined that the filing of individual impact statements for each term coal contract would conflict with the Act's competitive bidding requirements. The court went on to find that, even absent a statutory conflict, the programmatic EIS and the applicable TVA regulations were within the spirit of the recommendations set out by the Council on Environmental Quality. 367 F.Supp. at 131.

The court does not believe that the same conclusions are permissible in the present case. As noted above, the 102(2)(C) requirements are not to be dispensed with lightly. In section 102 Congress authorizes and directs preparation of detailed impact statements "to the fullest extent possible." This language has been consistently construed to require compliance with NEPA unless such compliance would give rise to a violation of other statutory authority under which the agency is proceeding. Natural Resources Defense Council v. TVA, *supra,* 367 F.Supp. at 125; Environmental Defense Fund v. TVA, 468 F.2d 1164, 1175 (6th Cir. 1972); Calvert Cliffs' Coordinating Committee v. AEC, *supra,* 449 F.2d at 1114–1115. No such

13. 16 U.S.C. § 831h(b) (1970).

direct conflict between NEPA and the Taylor Grazing Act exists. The Taylor Act is not purely environmental since it is aimed at promoting the highest use of the public lands; NEPA seeks to protect the environment. *Compare* 43 U.S.C. § 315 (1970) *with* 42 U.S.C. § 4321 (1970). These two purposes, as pointed out above, are not the same, but are not in such conflict that a rigorous application of NEPA would give rise to violations of the Taylor Act.

Moreover, in Natural Resources Defense Council v. TVA, *supra,* the plaintiffs sought to compel the agency to file a statement for each long term coal contract. The entire operation of numerous generating facilities was dependent on securing coal supplies, and prices in the coal market fluctuated greatly. Delay caused by the preparation of impact statements, normally six months to a year, would have limited seriously the number of coal companies which would bid on TVA term coal contracts. 367 F. Supp. at 125–126. No such considerations are present in this case. Plaintiffs do not ask that impact statements be filed for every license or permit issued or renewed by the BLM. Nor do they seek an immediate injunction of the licensing program which could admittedly have a most deleterious effect on the entire livestock industry. While the permit program might be jeopardized at some future time, livestock operators would not be affected at this time by a finding that the programmatic EIS prepared by the BLM was legally insufficient.[14]

The purposes of an EIS were summarized by the court in Environmental Defense Fund v. TVA, 339 F. Supp. 806 (E.D.Tenn.), aff'd, 468 F.2d 1164 (6th Cir. 1972) as follows:

"The purpose of a section 102(2)(C) detailed environmental impact statement is (1) to aid the agency's decision-making process and (2) to advise the public of the environmental consequences of the proposed action. The requirement seeks to insure that each agency decision-maker has before him, and takes into proper account, all environmental impacts of a particular project. Only if this is done will the most intelligent, optionally [sic] beneficial decision be likely to result. Moreover, the detailed statement provides evidence that these factors have been taken into account. More importantly, it allows those removed from the decision-making process to evaluate and balance the factors on their own. *Id.* at 810.

In the BLM grazing license program the primary decision-maker is generally the individual district manager, with his staff, who approves license applications. While the programmatic EIS drafted by the BLM provides general policy guidelines as to relevant environmental factors, it in no way insures that the decision-maker considers all of the specific and particular consequences of his actions, or the alternatives available to him.[15] The proposed EIS does not provide the detailed analysis of local geographic conditions necessary for the

---

14. In Scientists Institute for Public Information, Inc. v. AEC, *supra,* the Court of Appeals for this Circuit approved a programmatic statement as an appropriate manner by which to assess a broad program to develop nuclear reactors. It did not, however, condone the filing of a mere environmental survey. In addition, the programmatic statement covered future, not ongoing action.

As plaintiffs point out, at least one type of program statement referred to in the CEQ Guidelines would be appropriate "in order to assess the environmental effects of a number of individual actions on a given geographical area." *See* 40 C.F.R. § 1500.5(1) (1974). That does not, strictly speaking, encompass the present situation since the

"given geographical area" contemplated by the BLM's EIS is comprised of 171 million acres. In the present case, plaintiffs are seeking impact statements focused at the district or local level for purposes of assessing the environmental effects of permits for the grazing of livestock on such local geographic areas.

15. CEQ Guidelines provide as follows:
"The amount of detail provided in such descriptions should be commensurate with the extent and expected impact of the action, and with the amount of information required at the particular level of decisionmaking (planning, feasibility, design, etc.)." 40 C.F.R. § 1500.8(a)(1) (1974).

decision-maker to determine what course of action is appropriate under the circumstances.

Additionally, the programmatic EIS does not allow those who are not part of the decision-making process to adequately evaluate and balance the factors on their own. While NEPA does not require public hearings, it does provide a formalized procedure for such citizen input. In the present case the public will have the opportunity to comment only on the programmatic impact statement. Undoubtedly national organizations, such as plaintiff NRDC, will provide comments and engage in the review process. However, when it comes to the actual implementation of the licensing permit program at the local level, there will be no opportunity for particularized input by state and local citizens.[16] Even though the actual permits may be made public, that provides only information from the government to the citizens and does not allow information to flow from the citizens to the government.[17] As the court stated in Calvert Cliffs' Coordinating Committee v. AEC, *supra*, "[c]oncerned members of the public are thereby precluded from raising a wide range of environmental issues in order to affect particular . . . decisions. And the special purpose of NEPA is subverted." 449 F.2d at 1123.

Returning again to Natural Resources Defense Council v. TVA, *supra*,

one last important factor distinguishes the case at bar from the coal contract situation. The mandatory TVA contract provision required mining companies to submit a pre-mining report prior to the time TVA awarded its contracts. Each report considered environmental problems such as acids, slides, erosion and esthetics involved in the particular area to supply the coal under the contract. 367 F.Supp. at 127–128. Such reports appear to deal in a most particularized and detailed manner with the environmental factors specifically related to the area to be mined. While the BLM has certain licensing requirements, they relate mainly to the timing and duration of the allowable grazing period and the number of animals involved.[18] The court has examined the Federal Range Code, 43 C.F.R. § 4110.0–2 et seq. (1973), portions of the BLM Manual, and sample licenses and finds them insufficient to fulfill the purpose defined for an impact statement. They do not adequately assess[19] the individual district or area situations so as to provide the local decision-maker with the data necessary to analyze the alternatives open to him and their consequences.[20] A program statement may be very helpful in assessing recurring policy issues and insuring consideration of the cumulative impact that numerous decisions might have on the environment, but that does not mean that it will suffice to ful-

---

16. The only real opportunity for local comment appears to be after the preparation of the unit resource analysis.

17. There has been some recognition by the BLM that this type of input is desirable, as witnessed by the expansion of the Grazing Advisory Boards from merely livestock operators to include some environmental representatives. *See generally* 43 C.F.R. §§ 4114.1–1, 4114.2–1, 4114.3–1 (1973).

18. Permits and leases for terms, generally 10 years, are made only after an AMP is agreed to between BLM and the grazer. The AMP is therefore a part of the term permit. In areas for which no AMP has been prepared only annual licenses are issued.

19. Indeed the BLM itself, in its report concerning public lands in Nevada, indicates that the MFP's should be more specific in their

recommendations and get away from "motherhood statements." Bureau of Land Management, Effects of Livestock Grazing on Wildlife, Watershed, Recreation and Other Resource Values in Nevada, *supra*, at 9. The report also notes that many Nevada AMP's are ineffective and did not have sufficient studies made on them. *Id.* at 6. This is not to say, however, that a thorough and adequate AMP, in conjunction with a programmatic statement might not meet the NEPA requirements. However, AMP's exist for only a portion of the millions of acres supervised by the BLM.

20. In Natural Resources Defense Council v. TVA, *supra*, the court also found that the Council on Environmental Quality had given the impression that it had accepted the procedure of a single program statement for TVA's coal purchases. No such representation has been made in the present case.

fill the NEPA mandate. The court is convinced that the BLM programmatic statement alone, unrelated to individual geographic conditions, does not permit the "finely tuned and 'systematic' balancing analysis" mandated by NEPA. See Calvert Cliffs' Coordinating Committee v. AEC, supra, 449 F.2d at 1113.

While the BLM may decide in the future to prepare specific impact statements on new activities, for the present grazing will continue on millions of acres without adequate individualized assessment of the impact of such grazing on local environments,[21] and extensive environmental damage is possible. Indeed, the plaintiffs note that the BLM Budget Justification for fiscal year 1973 estimated that only 16 percent of the BLM managed grazing land was in good or excellent condition while 84 percent was in fair, poor or bad condition. In addition, plaintiffs present evidence from both private and governmental sources demonstrating that serious deterioration of BLM lands is taking or has taken place. In its first annual report, the Council on Environmental Quality reported that overgrazing had dramatically affected the public lands.

> "Much of this land, particularly the vast public domain, remains in desperate condition, as wind, rain, and drought have swept over them and eroded their exposed soils. Although the effects of overgrazing in rich pastures or prarie farmland can be quickly corrected, the process is often irreversible on the limited soils and arid climate of much of the public lands." CEQ, Environmental Quality 182 (1970).

Unfortunately this situation has not been rectified since that date. A recent Bureau of Land Management report entitled Effects of Livestock Grazing on Wildlife, Watershed, Recreation and Other Resource Values in Nevada (April 1974) documents the serious damage being wrought on the environment. The report, compiled by a team of BLM resource managers, states flatly that wildlife habitat is being destroyed. "Uncontrolled, unregulated or unplanned livestock use is occurring in approximately 85 percent of the State and damage to wildlife habitat can be expressly only as extreme destruction." Id. at 13. Overgrazing by livestock has caused invasion of sagebrush and rabbitbrush on meadows and has decreased the amount of meadow habitat available for wildlife survival by at least 50 percent. The reduced meadow area has caused a decline in both game and non-game population. Id. at 26. In addition, there are 883 miles of streams with deteriorating and declining wildlife habitat, thus making it apparent, according to the report, that grazing systems do not protect and enhance wildlife values. Id. at 14, 29.[22]

While Congress has determined that public lands should be put to the best use possible, it has also demonstrated a strong interest in protecting the environment. In the present case over 100 million acres of public land are being leased for grazing although apparently no thorough analysis has been made of the specific impact of such activity. The court is, therefore, of the opinion that major federal actions having significant effects on the environment are being taken without full NEPA compliance, even though that Act has been in effect almost five years.

The court is aware that, like many agencies, the BLM has been given large scale tasks to be accomplished with limited manpower. That does not mean, however, that the agency may ignore or pay mere lip service to the NEPA re-

---

21. The court is cognizant of the fact that the Department of the Interior is also preparing several other programmatic statements on activities such as watershed protection and herbicide usage which relate in part to grazing. There is nothing, however, to support an argument that "major individual actions" can proceed without a specific

EIS while "broad program statements" are under preparation.

22. Whether the original deterioration occurred before or during BLM management is irrelevant since the crucial questions are whether it can be allowed to continue and whether it will be exacerbated by continued grazing.

quirements. In addressing a similar problem in Natural Resources Defense Council v. Train, *supra*, Judge Leventhal wrote:

"Although these steps may be cumbersome, even awesome, they may well be within the agency's grasp, at least generally. The court's injunction should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources. This may run the risk of overstimulating the organism, but palliative measures may be taken with regard to specific categories if indicated at a later date." 510 F.2d at 712.

Judge Leventhal continued:

"If relief is granted by the court, the issue of any shortfall in performance by the agency will become a matter for discussion within the pertinent committees and bodies of the legislature. The court will have done all that the legislature could fairly have contemplated from the judicial function of assuring executive compliance with the legislative mandate." at 714.

■ For the above reasons the court will grant relief to the plaintiffs by entering a judgment declaring that the programmatic environmental impact statement prepared by the BLM, standing alone, is not sufficient to comply with the NEPA requirements. As noted above, plaintiffs have not sought an impact statement for each permit. The crucial point is that the specific environmental effects of the permits issued, and to be issued, in each district be assessed. It will be initially within the BLM's discretion to determine whether to make this specific assessment in a separate impact statement for each district, or several impact statements for each district, or one impact statement for several districts or portions thereof, or indeed by other means. So long as the actual environmental effects of particular permits or groups of permits in specific areas are assessed, questions of format are to be left to defendants. The court will maintain jurisdiction in order to facilitate future review of the methods chosen by the BLM, and a time period

for agency formulation of procedures will be set by subsequent order on recommendation of the parties. An appropriate Judgment accompanies this Memorandum Opinion.

## JUDGMENT

This matter came before the court on the cross-motions of plaintiffs, federal defendants, and defendants-intervenors for summary judgment. This court having determined that the federal defendants have violated § 102(2) of the National Environmental Policy Act, 42 U. S.C. § 4321 et seq. (1970), with respect to their issuance or renewal of permits for the grazing of domestic livestock upon the Public Lands administered by the Bureau of Land Management and that plaintiffs are, therefore, entitled to declaratory relief, it is by the court this 30th day of December, 1974,

Ordered that plaintiffs' motion for summary judgment as to the federal defendants' violation of the National Environmental Policy Act be, and the same hereby is, granted; and it is further

Ordered that the motions of federal defendants and defendants-intervenors for summary judgment be, and the same hereby are, denied; and it is further

Ordered, Adjudged and Declared that:

1. The proposed Bureau of Land Management programmatic environmental impact statement, standing alone, is not sufficient to comply with the requirements of § 102(2) of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1970);

2. Defendants Rogers C. B. Morton and Curtis J. Berklund have a mandatory, non-discretionary duty pursuant to § 102(2) to prepare, publicly circulate, and consider environmental impact statements which satisfy the National Environmental Policy Act in all respects and which discuss in detail the environmental effects of the proposed livestock grazing, and alternatives thereto, in specific areas of the public lands which are or will be licensed for such use, subject to the timetable to be established pursuant to paragraphs 3 or 4 of this Order and in accordance with the Memoran-

dum Opinion accompanying this Judgment;

3. The federal defendants shall confer with plaintiffs within the next thirty days for the purpose of determining whether the parties can agree on a schedule for preparation of the above-described statements. Upon such agreement, the parties shall submit a stipulation which sets forth that schedule for this court's approval and entry of a further order thereon;

4. In the event that the parties cannot agree on a schedule for the preparation of the above-described statements they shall so advise this court by motion or otherwise not later than forty-five days after entry of this Order, and they shall request this court to set an appropriate schedule or indicate whether discovery is required to determine same; and

5. This court shall retain jurisdiction of this matter until the federal defendants have complied with the terms and conditions of this judgment; and it is further

Ordered and adjudged that judgmen. be entered for plaintiffs.