**SIERRA CLUB et al., Plaintiffs,**

v.

**Rogers C. B. MORTON and Roy L. Ash, Defendants.**

**Civ. A. No. 74–1017.**

United States District Court, District of Columbia, Civil Division.

June 6, 1975.

**1188**

Bruce J. Terris, Washington, D. C., for plaintiffs.

L. Mark Wine, William M. Cohen, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter is before the Court on cross-motions for summary judgment. Plaintiffs claim that annual budget proposals for financing the National Wildlife Refuge System involve a "recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . ." under Section 102(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C), and that the defendants are therefore required to issue a detailed statement on the environmental impact of such annual budget proposals. Defendants seek dismissal of the action on several grounds. The matter has been thoroughly briefed by both sides.

All the cases that have considered this precise issue, as well as the Council on Environmental Quality's regulations, hold that appropriation requests are "proposals for legislation" within the meaning of NEPA.

In *Environmental Defense Fund* v. *T. V. A.*, 468 F.2d 1164, 1181 (6th Cir. 1972), the Court stated that the phrase "proposals for legislation" as used in NEPA embraces annual appropriations requests: "The same results obtain if we construe the phrase 'proposals for legislation' in section 102(2)(c) as did the District Court to encompass annual appropriation requests. Under 31 U.S.C. § 22, the head of each federal agency must prepare each year a request for regular, supplemental, or deficiency appropriations to be submitted to Congress by the President under 31 U.S.C. § 11. Unquestionably, to construe these budgetary requests as proposals for legislation within the meaning of NEPA would facilitate Congress' expressed purpose of constant revision and reevaluation of ongoing projects." See also, *Scientists' Inst. for Pub. Info. Inc.* v. *Atomic Energy Com'n,* 156 U.S.App.D.C. 395, 481 F. 2d 1079 (1973); *Environmental Defense Fund* v. *Tennessee Valley Auth.*, 339 F. Supp. 806 (E.D.Tenn.1972); *Sierra Club* v. *Froehlke*, 359 F.Supp. 1289 (S. D.Texas 1973).

Further, the Council on Environmental Quality (C.E.Q.), the agency established by NEPA to serve as a research and advisory body to the President, has published guidelines that track the statute and support plaintiffs' position. The Council's regulations provide for the preparation of an impact statement whenever an action is determined to be a major action significantly affecting the quality of the human environment. 38 Fed.Reg. 20550 (1973), 40 C.F.R. 1500 *et seq.* "Actions" are interpreted to include "recommendations or favorable reports relating to legislation *including requests for appropriations.*" (emphasis added). 40 C.F.R. 1500.5. The C.E.Q. Guidelines are entitled to great weight, and constitute a persuasive interpretation of NEPA. *Environmental Defense Fund* v. *Tennessee Valley Auth.*, 468 F.2d 1164 (6th Cir. 1972). Moreover, the Department of Interior's regulations follow the C.E.Q. Guidelines by providing that impact statements should be prepared in connection with appropriation proposals. 36 Fed.Reg. 19342. Section 516.2.5.A provides:

"A. Types of federal actions to be considered include, but are not limited to:

(1) Recommendations or favorable reports to the Congress re-

lating to legislation, including appropriations."

The Court therefore concludes that annual proposals for financing the National Wildlife Refuge System are proposals for legislation within NEPA.

The Court is also of the opinion that annual proposals for financing the Refuge System are major Federal actions which clearly have a significant effect on the environment. The statutory phrase "actions significantly affecting the quality of the environment" has been held to be "intentionally broad, 'reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency.'" *Natural Resources Defense Council, Inc.* v. *Morton,* 388 F.Supp. 829 (D.D.C.1974, J. Flannery). Taking into account the nature and size of the Refuge System (350 refuges containing about 30 million acres), and the amount of the Refuge System's budget (about $200 million annually), it is evident that the scope of such budget project is far broader in terms of environmental impact than that of other proposed federal actions discussed in impact statements, such as a single canal, *Environmental Defense Fund* v. *Corps of Engineers,* 324 F.Supp. 878 (D.D.C.1971), or dam, *Environmental Defense Fund* v. *Corps of Eng. of U. S. Army,* 325 F. Supp. 749 (E.D.Ark.1971).

It goes without saying that budget decisions have a direct bearing on how the Refuge System will be staffed, managed and maintained. We think it equally clear that when the important interrelationship between the Refuge System and the budget process is considered, the unmistakable conclusion is that both the environmental impact of budget decisions is significant and that the federal action involved is major.

Defendants would counter the thrust of the clear language of the statute and the cited decisions with a variety of contentions. We now deal with certain of them.

Defendants argue that it would be impractical, if not impossible, and administratively burdensome to prepare impact statements at the budget proposal stage. Defendants assert that final budget decisions are made less than one month before the President submits his budget recommendations in December prior to the commencement of the new fiscal year in July and that most budget decisions are not undertaken until September. Thus, defendants contend, the budget of the Department of the Interior is developed in a very short time frame, i. e., about four months.

■ Several courts, in considering and rejecting administrative difficulty as a defense under NEPA, have emphasized that NEPA requires compliance to the fullest extent possible. In *Calvert Cliffs' Coord. Com.* v. *U. S. A. E. Com'r.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), the defendants argued that compliance with the Act would place an enormous burden on the agency. The Court noted that ". . . the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a conflict of statutory authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance." (p. 1115) See also *Environmental Defense Fund* v. *T. V. A.,* 468 F.2d 1164 (6th Cir. 1972).

Nor does the Court believe that compliance with NEPA is impossible. Defendants would convey the mistaken impression that appropriation proposals are emergency measures taken in response to some unforeseen event. Yet, defendants know that they are required to submit an annual appropriation proposal to Congress. Defendants, in fact, concede that the budget process begins about twenty months before the beginning of the fiscal year and some fifteen months before the budget proposal is submitted to Congress. There is thus no reason to delay preparation of the impact statement until September or De-

cember of each year when final budget decisions are made. If no final, definite budget is in existence prior to that time, defendants should, to the fullest extent possible, prepare an impact statement that considers the various alternatives available at that time.

The Court's conclusion that defendants need not wait until final budget decisions have been reached before preparing an impact statement also finds support in the case law. The courts are in agreement that "federal action" within NEPA covers "proposals" as well as final decisions. The concept of NEPA is that officials give thought to the consequences on the environment *before* a significant project is launched. Therefore, what is assessed is "proposed action, not a fait accompli." *City of Boston* v. *Volpe*, 464 F.2d 254 (1st Cir. 1972). Moreover, the courts have repeatedly held that an impact statement should be prepared at as early a stage as possible in the development of a proposal to ensure compliance with the Act. *Calvert Cliffs' Coord. Com.* v. *U. S. A. E. Com'n, supra.* For the foregoing reasons the Court is of the opinion that it is irrelevant that final budget decisions are presently made in a very short time frame. NEPA requires defendants to draft an impact statement as early as possible and in time to accompany "proposals" through the agency review process.

Nor does the Court believe that under the rationale of plaintiffs' argument "hundreds or thousands of annual environmental impact statements would have to be prepared . . ." (Defendants' Reply Memorandum, p. 23). NEPA only requires that impact statements be prepared on those legislative proposals and federal actions significantly affecting the environment. Appropriation proposals for most federal agencies would not appear to pose a threat to the environment and therefore no impact statement would be required. In any event, even as to those agencies whose operations do significantly affect the environment, only one impact statement is required for the appropriation proposal. When it is noted that the Department of Transportation prepared 196 impact statements in just the first six months of 1974, C.E.Q., Fifth Annual Report, p. 390 (1974), it is difficult to accept the contention that the cumulative impact of today's decision will impose an insurmountable burden.

Defendants also argue that the budget process is privileged until the President adopts the budget and presents it to the Congress. OMB Circular No. A–10. Defendants therefore maintain that an impact statement cannot be prepared and made public until after the President has transmitted the budget proposal to Congress. Defendants claim that budget information is privileged under the Freedom of Information Act (FOIA), exemption 5.

Exemption 5 of the FOIA, 5 U.S.C. 552(b)(5), covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

In *EPA* v. *Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), a landmark case in construing exemption 5, the court considered the legislative history of exemption 5 and concluded that "Congress intended to incorporate generally the recognized rule that 'confidential intra-agency advisory opinions . . . are privileged from inspection.'" The court noted that the exemption was intended to protect the deliberative or policy-making processes of government. Thus, for purposes of applying exemption 5, a distinction is drawn between "predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision, which are exempt from disclosure, and post-decisional memoranda setting forth the reasons for an agency decision already made, which are not." *Renegotiation Board* v. *Grumman Aircraft*, 421 U.S. 168 at p. 184, 95 S.Ct. 1491, at p. 1500, 44 L.Ed.2d 57 (1975).

Appropriation proposals are a type of communication made after the budget decision has been made or the policy already adopted, and hence "their disclosure poses a negligible risk of denying to agency decisionmakers the uninhibited advice which is so important to agency decisions." *NLRB* v. *Sears, Roebuck & Co.*, 421 U.S. 132 at p. 152, fn. 19, 95 S.Ct. 1504 at p. 1517, fn. 19, 44 L.Ed.2d 29 (1975). Budget appropriation requests are thus the final product in the agency's decision-making process with regard to budgets, and as such, cannot be termed pre-decisional. Final decisions are disclosable under the FOIA. Since budget appropriation requests are final and cannot be termed pre-decisional, the Court concludes that such appropriation requests, whether made by the Department of the Interior or the Office of Management and Budget, both of which are federal agencies, are not privileged from disclosure under exemption 5 of the FOIA. *A fortiori*, environmental impact statements accompanying budget requests, are also not protected from disclosure under exemption 5. Whether hardship or inconvenience may result, requests for relief should be addressed to the Congress, not to the courts.

Finally, defendants assert that their proposed programmatic statement will serve as the equivalent of an environmental impact statement.

Defendants are preparing such a draft statement which will discuss the entire operation and administration of the Refuge System, including funding alternatives. The final programmatic statement is planned to be completed by November, 1975. Accordingly, defendants argue plaintiffs' complaint is premature and ask the Court to stay this case pending completion of the final programmatic statement.

Admittedly, the programmatic statement is designed to provide an overview of the Refuge System and will only secondarily emphasize the environmental impacts on the system of budget requests. Although the programmatic statement will serve as the foundation for subsequent environmental analyses and for supplemental impact statements, the statement will only be "periodically updated" with no definite time frame mentioned for revision.

Like the court in *Natural Resources Defense Council, Inc.* v. *Morton, supra,* we are convinced that the programmatic statement is "insufficient to fulfill the purpose defined for an impact statement." The programmatic statement is designed to consider the general long-range goals of the Refuge System whether or not such goals are being considered by defendants in developing appropriation proposals. The programmatic statement is thus directed at a different subject than the environmental impact statement and cannot serve as a substitute. "A program statement may be very helpful in assessing recurring policy issues and insuring consideration of the cumulative impact that numerous decisions might have on the environment, but that does not mean that it will suffice to fulfill the NEPA mandate. The Court is convinced that the . . . programmatic statement alone, . . . does not permit the 'finely tuned and "systematic" balancing analysis' mandated by NEPA." *Natural Resources Defense Council, Inc.* v. *Morton, supra.*

For the foregoing reasons plaintiffs are granted summary judgment because there is no genuine issue as to any material facts, and the plaintiffs are entitled to judgment as a matter of law. An appropriate order has been entered.