AMERICAN HORSE PROTECTION AS-
SOCIATION, INC., a Virginia non-
profit corporation, Plaintiff,

v.

Dale Kent FRIZZELL, acting Secretary,
United States Department of In-
terior, et al., Defendants.

Civ. No. LV 75–143 RDF.

United States District Court,
D. Nevada.

Oct. 2, 1975.

Robert C. McCandless, Washington, D. C., for plaintiff.

John E. Lindskold, Atty., U. S. Dept. of Justice, James Coda, Atty., U. S. Dept. of the Interior, Washington, D. C., U. S. Atty. Lawrence J. Semenza by Asst. U. S. Atty. Wm. C. Turner, Las Vegas, Nev. for defendants Frizzell, Berklund, Turcott, Wilkes, Rowland and Nodine.

Atty. Gen. Robert List by Wm. E. Isaeff, Deputy Atty. Gen., Las Vegas, Nev., for State of Nevada defendants Ballow, Raetz and Lee.

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ROGER D. FOLEY, Chief Judge.

Plaintiff filed this action on July 23, 1975, in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief against the various federal defendants concerning a proposed Bureau of Land Management (BLM) round up of wild horses in Stone Cabin Valley, Nevada. On July 24, 1975, the district court in the District of Columbia granted defendants' motion for a change of venue and ordered that the action be moved to the United States District Court for the District of Nevada.

On September 10, 1975, plaintiff filed an amended complaint in this Court and a motion for a temporary restraining order to prohibit the defendants from conducting the proposed wild horse roundup. The amended complaint added the state defendants to this action. On Sep-

tember 11, 1975, this Court denied plaintiff's motion for a temporary restraining order and agreed to treat that motion as a motion for a preliminary injunction. On September 17, 1975, a hearing on plaintiff's motion was conducted in this Court. This memorandum and order is the Court's decision on that motion.

FACTS

The Stone Cabin Valley contains about 385,000 acres of land (encompassing an area of approximately 600 square miles) and is located in central Nevada, about 25 miles east of Tonopah, Nevada. About 99% of the land is National Resource Land, within an established BLM grazing district; the remaining 1% is under private ownership. The land may be characterized as predominantly desert, with vegetation consisting of big sagebrush, black sagebrush, saltbrush, greasewood, and plya. At the higher elevations along the mountain ranges which border the Valley, vegetation consisting of pinion-juniper woodland is present.

Several desert land entry farms have been located in the Valley, but only one is active. Three cattle operations use the grazing unit, with about 2400 head consuming about 15,400 Animal Unit Months (AUMs) per year. A 1959 range survey showed production of vegetation in the Valley at 19,782 AUMs per year. Of these, 2,011 AUMs were reserved for wildlife and 17,771 AUMs for livestock. Since licensed livestock grazing use is 15,400 AUMs, about 2,300 AUMs remain uncommitted or available for wild horses.

Estimates of the number of wild horses in Stone Cabin Valley range from a figure of 200–300 (provided by plaintiff based on an aerial count conducted in June, 1975) to BLM estimates of 1000–1200 (based on statistically-computed estimates, using an 18% per year rate of increase). Plaintiff's most qualified expert, Dr. David W. Kitchen of Humboldt State University, estimates that about 900 horses currently populate the Stone Cabin Valley and that their population is stable. He acknowledges that his population estimates are similar to those of the BLM, but states that "finding a similar population size does not necessarily support or refute the need to remove wild horses from Stone Cabin Valley. At present data are insufficient to permit a decision regarding removal of horses from the present population." (Affidavit of Dr. Kitchen of September 12, 1975, attached to plaintiff's supplemental memorandum of points and authorities in support of motion for a preliminary injunction, filed September 16, 1975.) This Court finds that the estimates of Dr. Kitchen and those of the BLM support a population of wild horses ranging from 900–1200 currently in Stone Cabin Valley.

Almost all of the material presented to this Court indicates that there is a serious overgrazing problem in the Stone Cabin Valley. Government affidavits show that the range is and has been deteriorating because of overgrazing for many years. One Government affiant, C. Wayne Cook of Colorado State University, estimates that even if the horses are removed immediately, twenty to fifty years will be required for the recovery of the understory forage plants on the range area. He asserts that "unless substantial numbers of wild horses are removed in the near future it will require a hundred years or more for recovery of this range area . . ." (Affidavit of Dr. Cook of September 11, 1975, attached to defendants' memorandum in opposition to plaintiff's motion for a preliminary injunction, filed September 16, 1975.) Several members of plaintiff organization viewed the range in the summer of 1975 and report that the range appears in good condition. Apparently, 1975 has been a good year in terms of rainfall and other conditions favorable to vegetative growth; the years just prior to 1975 had been bad, and the range condition overall remains poor. Defendants' evidence indicates

that one good year of precipitation will not bring back an abused and deteriorating range. The understory forage plants require several years of growth to strengthen the vegetative resources of the range. The affidavit of plaintiff's expert, Dr. Kitchen, confirms the poor condition of the range:

. . . the overall range condition of the Valley is poor compared to this range's condition 50 years ago. The deterioration of range condition in this area *is not recent,* but has occurred over a long period. Stone Cabin Valley has received heavy grazing pressure from cattle and sheep for a long time and most of the decline in range condition can be attributed to historical overgrazing before 1972 and not simply a recent, small increase in wild horses.

9. The range is not going to collapse suddenly or change dramatically from its present quality in one or two years . . . It is apparent that some range deterioration was due to drought and not to increased numbers of wild horses.

(Affidavit of Dr. Kitchen of September 12, 1975) (emphasis in original).

The primary dispute regarding range condition, then, is over how the deterioration has been caused, and not over the fact that the range is in poor condition.

Faced with the problem of a deteriorating range in Stone Cabin Valley, BLM officials in Nevada began exploring ways to preserve the range. In the fall of 1974, these officials settled on a proposal to remove approximately 400 wild horses deemed to be in excess of the 1971 population. On January 10, 1974, BLM's proposal to gather wild horses was submitted in final form by Gene Nodine, BLM's Battle Mountain District Manager and a defendant in this action, to E. I. Rowland, BLM's State Director for Nevada. This pro-

posal was submitted to BLM officials in Washington, D.C., for approval (see memorandum from Mr. Rowland to the Director of BLM, dated May 2, 1975). On May 30, 1975, BLM Director Curt Berklund authorized the gathering and removal of about 400 excess wild free-roaming horses from the Stone Cabin Valley (see memorandum from Mr. Berklund, attached as Exhibit B to defendants' original memorandum in opposition to plaintiff's motion for a temporary restraining order, filed on July 23, 1975, in the District Court for the District of Columbia). An affidavit of Mr. Berklund of July 23, 1975, indicates that the National Advisory Board for Wild Free-Roaming Horses and Burros [1] toured the Stone Cabin Valley and concurred that the Valley was heavily overgrazed; this tour was conducted in September, 1974. The affidavit also indicates that several other individuals and organizations have observed the Valley and support BLM efforts to protect the vegetative resources there, including the Governor of Nevada, the Nevada Department of Fish and Game, the National Wild Horse Association, and Wild Horse Organized Assistance, Inc. (WHOA!), Wild Horse Annie's organization (see letters attached as exhibits D, E, F, and G, attached to defendants' original memorandum in opposition to plaintiff's motion for a temporary restraining order, filed on July 23, 1975). None of these individuals or groups have protested this round up (the Court notes that Wild Horse Annie, Velma B. Johnston, and her organization, based in Reno, Nevada, have long been active and ardent supporters of wild free-roaming horses. The 1959 law prohibiting the use of aircraft and motor vehicles to hunt wild horses on public lands is commonly known as the "Wild Horse Annie Act". See 18 U.S.C. § 47, and the legislative history accompanying Public Law 86–234, 1959 U.S.Code Cong. and Admin. News, p. 2253).

---

1. This board was appointed by the Secretaries of Interior and Agriculture, pursuant to the mandate of Section 7 of the Wild Free-Roaming Horses and Burros Act, Public Law 92–195, December 15, 1971, 16 U.S.C. § 1337.

BLM officials in Nevada prepared an Environmental Analysis Record (EAR) on the proposed round up as an interim program of range protection.[2] This report was signed on May 15, 1975, concluding that

. . . none of the alternative proposals discussed in this analysis constitute a major federal action significantly affecting the quality of the human environment and that an environmental impact statement will not be required for any alternative selected. (EAR at 32, attached as exhibit H to defendants' original memorandum in opposition to plaintiff's motion for a temporary restraining order, filed on July 23, 1975)

Five alternative actions were considered: (1) No action; (2) Delay action until the Tonopah Management Framework Plan (MFP) is revised (the revision is expected to be completed sometime in fiscal year 1977); (3) Remove 400 wild horses from Stone Cabin Valley; (4) Remove cattle by a number sufficient to reduce grazing demand to the 1971 level; and (5) Remove equal numbers of horses and livestock to reach the 1971 level of grazing demand. At the time the EAR was signed, the BLM officials in Nevada had already submitted their proposal to implement alternative (3) to BLM officials in Washington; the wild horse round up was awaiting approval by defendant Mr. Berklund, which came on May 30, 1975.

Representatives of plaintiff organization met with some of the defendants on April 30, 1975, in an informal meeting to discuss the proposed round up. Plaintiff's representatives were not convinced of the necessity for the round up, but accepted an invitation from the defendants to tour the Stone Cabin area. This tour was conducted by BLM offi-cials for plaintiff's representatives on June 30 and July 1, 1975, thoroughly covering the Valley by jeep and airplane. Plaintiff's representatives were not persuaded that the round up was necessary. See plaintiff's amended complaint at p. 7. Counsel for plaintiff wrote to defendant Berklund on July 11, 1975, requesting that the round up be cancelled. Mr. Berklund refused this request in a letter to plaintiff's counsel, dated July 17, 1975. These two letters were filed with the original complaint on July 23, 1975, in the District of Columbia.

About July 22, 1975, defendants began the round up and captured about 75 wild horses over the next six or seven days. At least three horses died during this round up. On July 28, 1975, Nevada State officials halted the round up by impounding the horses already gathered, alleging that the State of Nevada maintained jurisdiction over the wild horses and that the round up was in violation of Nevada law. BLM officials were unable to agree with Nevada State officials regarding this problem; on August 6, BLM decided to terminate plans to continue this round up and the gathered horses were turned back onto the range.

On September 3, 1975, State and BLM officials entered a cooperative agreement providing for the resolution of federal and state disputes concerning jurisdiction over the horses. Under this agreement, the round up would be restarted. Any horses captured that are branded will be given to the State for disposition, since branded animals are not within the definition of a wild horse under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1332(b). Unbranded horses with no signs of private ownership will be given to BLM for distribution under its private maintenance program.[3] Horses fitting a third

---

2. The defendants do not contend, and this Court does not find, that the EAR meets the requirements of an environmental impact statement under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C).

3. BLM has received applications from interested individuals throughout the country concerning the acquisition of a wild horse. A copy of the application form is attached to plaintiff's original complaint. Wild Horse Annie's organization, WHOA!, has been in-

category, i. e., unbranded but showing some signs of private possession at some previous time, such as saddle marks or bridle marks, will be released on the range. With this agreement resolving federal-state conflicts regarding the round up, BLM rescheduled the round up for September 10, 1975.

The round up began as scheduled. BLM has argued that the round up must proceed now before the cold and wet winter begins, since the method being used is not effective during such weather.[4] BLM estimates that the round up of 400 horses will take approximately six to eight weeks to complete. Since its beginning on September 10, more than 100 horses have been captured, according to BLM sources.

## PROCEDURAL ISSUES

The State defendants challenge this Court's jurisdiction over the subject matter of this action. Both the Federal and State defendants challenge plaintiff's standing to bring this suit. The Federal defendants also argue that plaintiff has not exhausted its administrative remedies and that this suit is not ripe for determination by this Court.

*Jurisdiction.* Plaintiff cites five provisions which purport to give this Court jurisdiction: the general federal question statute (28 U.S.C. § 1331), the mandamus provision (28 U.S.C. § 1361), the Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202), the Administrative

Procedure Act (5 U.S.C. § 701 et seq., particularly 5 U.S.C. § 702), and the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.). Because the Court finds jurisdiction under 28 U.S.C. § 1331 and the APA, the other assertions of jurisdiction need not be discussed.

██ Plaintiff's argument that this case requires an interpretation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 et seq. (hereafter referred to as the Wild Horses' Act) and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., is sound. The federal questions involving the interpretation of these acts are clearly basic and in the forefront of this dispute. *Gully v. First National Bank in Meridian,* 299 U.S. 109, 118, 57 S.Ct. 96, 81 L.Ed. 70 (1936). The federal questions here are not patently immaterial or raised solely to confer jurisdiction. The Ninth Circuit has recognized federal question jurisdiction under NEPA. *Molokai Homesteaders Cooperative Association v. Morton,* 506 F.2d 572, 576 (9th Cir. 1974). See also *Trout Unlimited v. Morton,* 509 F.2d 1276 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir. 1973); *National Forest Preservation Group v. Butz,* 485 F.2d 408 (9th Cir. 1973); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973); in these cases, the Ninth Circuit has reached the merits in cases involving NEPA without discussing the jurisdictional base.

volved in screening applicants to insure that the captured horses go to people who can provide a good home for them. Statutory authority to distribute the captured horses to individuals is found in the Wild Horses' Act at 16 U.S.C. § 1333(b), and the regulations confirm the authority of BLM to make such arrangements for private distribution of excess horses. 43 C.F.R. § 4712.3–2(b).

4. The method being used is termed "water trapping". A corral is constructed which encircles a watering hole used by the horses. A man hiding in a blind nearby closes the corral gate whenever horses enter to use the water hole. The trapped horses are then transported to a holding corral, where medi-

cal tests and administrative tasks are performed. The horses are kept for a period of three or four weeks in the holding corral, pending the test results. The use of helicopters is thought to be a more humane method of gathering these animals, but this method is prohibited by 18 U.S.C. § 47. BLM has agreed with plaintiff's suggestions not to use barbed wire on the corrals and not to use the tranquilizer Sucostran, in an attempt to minimize the injuries to the horses, and provide the most humane conditions possible. See the letter from defendant Berklund to plaintiff's counsel, dated July 17, 1975.

■ The second obstacle to federal question jurisdiction is the requirement that at least $10,000 be in controversy. Nowhere in plaintiff's complaint is any pecuniary injury alleged. Setting a monetary value on the aesthetic, historical, and cultural interests in viewing and preserving wild horses in their natural habitat is very difficult, if not impossible. The difficulty in setting an amount in controversy here dictates a different look at jurisdictional amount. Looking at the matter from defendants' viewpoint, the Court notes that the round up involves the expenditure of about $50,000, in excess of the $10,000 minimum. See *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 366 F.Supp. 51 (D.C.D.C.1973):

> The parties agree, and it is well settled that in determining the amount-in-controversy, reference to either party's situation is appropriate. Where the case is worth at least $10,000 to the defendant, the requirement is satisfied just as fully as where a plaintiff can demonstrate the $10,000 value or sum. 366 F.Supp. at 60.

In *State Chartered Banks in Washington v. Peoples National Bank of Washington,* 291 F.Supp. 180 (W.D.Wash. 1966), that court stated:

> While there may be some doubt whether the evidence clearly establishes the requisite amount by the "value-to-the-plaintiff" test, there is no doubt if we apply the "value-of-the-thing-to be-accomplished-by-the-action" test. The latter test may relate to either party in the action; . . . 291 F. Supp. at 188.

This Court finds, then, that under the "value-to-the-defendant" or "value-of-the-thing-to-be-accomplished" tests, the jurisdictional amount of $10,000 is clearly established by the record.[5] This Court cannot say to a legal certainty that less than $10,000 is involved in this litigation. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Therefore, the Court finds that it has jurisdiction under 28 U.S.C. § 1331.

■ The Court also finds jurisdiction under the Administrative Procedures Act at 5 U.S.C. § 702:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Though the APA does not contain a specific grant of jurisdiction to the district courts, section 702 has been interpreted as permitting the courts to take jurisdiction when a plaintiff can show that he or she is aggrieved by agency action within the meaning of a relevant statute. Here, the question of jurisdiction overlaps the question of standing: if plaintiff has standing to challenge BLM's decision to conduct this round up, plaintiff is sufficiently aggrieved by agency action to maintain this action for judicial review of that agency action.

■ *Standing.* The legal requirement that one must have "standing" in order to bring an action is designed to assure that the parties to the suit have such a stake in the outcome of the litigation that the Court will have an actual

---

5. The Court notes that jurisdictional amount has not been an obstance in other lawsuits involving injury to aesthetic or other environmental interests. See Grad, *Environmental Law Treatise,* New York, Matthew Bender, 1974, § 9.03[2][b] at p. 9–139. One professor of environmental law has written: "Almost always the problem of jurisdictional amount has been resolved by one or more of three factors: (1) if plaintiff claims damages in excess of $10,000 in good faith, the court will not dismiss unless it appears to a legal certainty that the claim is really for less than the jurisdictional amount; (2) lack of judicial concern for jurisdictional amount; and (3) a tolerant attitude in allowing rights not inherently measurable in monetary terms to be appraised as having a high money value." Reitze, *Environmental Law,* Second Edition, Washington, D.C., North American International, 1972, at p. One–20.

"case" or "controversy" before it, as required by Article III of the United States Constitution. The standing requirement, then, is an off-shoot of the Article III case or controversy rule.

In recent years, the Supreme Court has revamped the law of standing. In the companion cases of *Data Processing Service v. Camp*, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Supreme Court established a two-prong test for standing to challenge agency action under the APA: (1) the challenged agency action must have caused plaintiff some "injury in fact", and (2) that injury must be to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agencies were claimed to have violated. Neither case, however, dealt with the question of what must be alleged by persons who claim injury of a noneconomic nature to interests which are widely shared by many in the population. Two other cases outlined the "injury in fact" requirement for standing in these types of actions. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

From *Sierra Club* and *SCRAP*, the following test for "injury in fact" can be formulated: this requirement can be met by alleging that the members of some group suffer an actual injury by the agency action; the injury can be to aesthetic or environmental values. The crucial factor is whether plaintiff alleges an actual injury in fact; the Court should find that standing exists where such an injury is alleged, despite an attenuated line of causation from the agency action to the injury and whether or not plaintiff will be able to prove ultimately that he has in fact suffered the alleged injury.

In this case, plaintiff's amended complaint alleges:

> Plaintiff . . . is a Virginia, non-profit corporation . . . Plaintiff has approximately 6,000 members, including members who are residents of Nevada and Washington, D. C. Plaintiff is dedicated to and its sole purpose is the welfare and protection of all horses, both wild and domestic. One of plaintiff's specific purposes is to protect the survival of America's remaining wild horses on the public land. *Among plaintiff's individual members are persons residing in the State of Nevada and the District of Columbia and other states who have in the past and have the right in the future to be users and enjoyers of the lands and wildlife which is the subject of this suit.* (Plaintiff's amended complaint at pp. 2–3) (emphasis added).

The president of plaintiff organization has authorized counsel to bring this action on behalf of the organization. (See letter of Joan R. Blue, plaintiff's exhibit no. 4, admitted at the hearing on the preliminary injunction, September 17, 1975). At oral argument, plaintiff named a Nevada member of the organization as a party who has viewed and desires to continue to view the wild horses in Stone Cabin Valley. The Court finds, then, that plaintiff has met the requirement of an "injury in fact" as set out in *Sierra Club* and *SCRAP*.[6]

The second aspect of the standing requirement is also met here: plaintiff's injury is to an interest "arguably within the zone of interests to be protected" by both the Wild Horses' Act and NEPA. The Congressional declaration of policy in the Wild Horses' Act, 16 U.S.C. § 1331, indicates that that statute is designed to protect the inter-

---

**6.** The Court feels that plaintiff's allegations of standing are closer to the allegations in *SCRAP* than to those in *National Resources*

*Defense Council v. United States Environmental Protection Agency*, 507 F.2d 905 (9th Cir. 1975).

ests of those who enjoy observing wild horses and burros in their natural habitat and who are interested in preserving elements of our national heritage that have historical and cultural value. NEPA also contains declarations of policy which indicate that plaintiff's injury is to an interest within the zone of interests which NEPA is designed to protect. See, in particular, 42 U.S.C. § 4321 and 42 U.S.C. § 4331(a), (b)(2) and (b)(4). Plaintiff's interest in the wild horses in Stone Cabin Valley, then, is an interest which both the Wild Horses' Act and NEPA are designed to protect. Since plaintiff has met both elements of the *Data Processing* and *Barlow* test for standing, plaintiff can bring this action and is a "person . . . . aggrieved by agency action" within the meaning of the Wild Horses' Act and NEPA; therefore, plaintiff can invoke the provisions for judicial review under the APA.

■ *Exhaustion of administrative remedies.* The APA provides that one must exhaust his administrative remedies before obtaining judicial review of the agency action. 5 U.S.C. § 704. This rule is modified, however, by the proposition that where the administrative remedy is inadequate and where plaintiff will suffer irreparable injury if the administrative decision is not reviewed, exhaustion will not be required. See Davis, *Administrative Law Treatise*, § 20.07.

■ In this case, any administrative remedy available to plaintiff through BLM is clearly inadequate, since the round up is proceeding. The time entailed in review through administrative channels will make this litigation moot: the horses will have been captured and given to private citizens who have applied for a horse. The injury to plaintiff's interest in these 400 wild horses will be irreparable if plaintiff is required to appeal to the Department of Interior. This is a case where the doctrine of exhaustion should not be invoked. The BLM decision is final in

that the round up has been authorized by defendant Berklund, the Director of BLM, and it is proceeding. Judicial review at this time will not interfere unduly with administrative processes, and there is no likelihood that agency error, if any, will be "washed out" in further administrative proceedings. Therefore, exhaustion is not required here.

■ Since no procedural barriers prevent plaintiff from bringing this action, the merits of plaintiff's motion for a preliminary injunction to stop the round up must be considered. The standards for determining whether the injunction should be ordered were set forth in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958): (1) Has plaintiff made a strong showing that it is likely to prevail on the merits?; (2) Has plaintiff shown that without such relief, it will be irreparably injured?; (3) Would granting the injunction lead to substantial harm for other parties?; and (4) Where lies the public interest? See *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970), aff'd sub nom. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1311, 31 L.Ed.2d 636 (1972); *Larry P. v. Riles*, 502 F.2d 963, 964 (9th Cir. 1974). Because the Court finds that plaintiff has not made a sufficient showing of the likelihood of success on the merits, the other standards for a preliminary injunction need not be discussed.

Plaintiff argues that the round up is illegal and should be enjoined, asserting four arguments supporting this claim: (1) the round up is a violation of the Wild Horses' Act; (2) the round up is in violation of NEPA in that an environmental impact statement (EIS) should have been prepared; (3) BLM's decision to round up wild horses is arbitrary, capricious, an abuse of discretion, and not in accordance with law; and (4) the Federal-State agreement of September 3, 1975, is contrary to law. Before discussing these claims, it is impor-

tant to point out that two different standards of review are required for claims (1) and (2). With regard to claimed violations of the Wild Horses' Act, this Court's function is two-fold: (a) Is BLM acting within its statutory authority in conducting the round up?; and (b) if so, is the decision to conduct the round up arbitrary or capricious under 5 U.S.C. § 706(2)(A)? With regard to claimed violations of NEPA, however, the Court must apply the § 706(2)(D) standard: was BLM's decision not to file an impact statement for this round up without observance of procedures required by law? See *Lathan v. Brinegar*, 506 F.2d 677, 692–693 (9th Cir. 1974):

. . . NEPA is essentially a procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The procedures . . . are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging, *pro forma* compliance will not do. We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA than if they confine themselves within the straight jacket of § 706(2)(A). 506 F.2d at 693.[7]

█ *Violations of the Wild Horses' Act.* Plaintiff argues that the BLM is violating its duties to manage and protect wild horses under the Wild Horses' Act, 16 U.S.C. § 1331 et seq. Defendants argue that wide discretion has been given to the Secretaries of Interior and Agriculture in managing wild horse populations, and that, under 5 U.S.C. §

701(a)(2), the round up is action committed by law to agency discretion and beyond judicial review. The APA exception for action committed by law to agency discretion is a narrow one, however. In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S. Ct. 814, 820, 28 L.Ed.2d 136 (1971), the Court pointed out:

The legislative history of the Administrative Procedure Act indicates that [the § 701(a)(2) exception] is applicable in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." S.Rep.No.752, 79th Cong. 1st Sess., 26 (1945).

Defendant refers to 16 U.S.C. § 1333(b) (Section 3(b) of the Wild Horses' Act) as giving the Secretary the discretion to conduct this round up. This section reads:

(b) Where an area is found to be overpopulated, the Secretary, after consulting with the Advisory Board, may order old, sick, or lame animals to be destroyed in the most humane manner possible, and *he may cause additional excess wild free-roaming horses and burros to be captured and removed for private maintenance* under humane conditions and care. (emphasis added)

The regulations reinforce this grant of discretion to the Secretary:

(a) The authorized officer may relocate wild free-roaming horses and burros on public lands when he determines such action is necessary to: (1) Relieve overgrazed areas, * * * or (4) achieve other purposes deemed to be in the interest of proper resource and herd management . . . 43 C.F.R. § 4712.3–2(a).

(b) The authorized officer may also place animals in the custody of private persons, organizations, or other gov-

---

7. The Court recognizes that *Lathan* involved the review of an EIS which had been filed. This case involves an agency's threshold decision that an EIS need not be filed. Both cases, however, deal with the essentially procedural requirements of NEPA, and the Ninth Circuit's language is applicable to the threshold agency determination here.

ernmental agencies. Custodial arrangements shall be made through cooperative agreement which shall include provisions to maintain and protect the animals and ensure that the animals will not be used for commercial exploitation . . . 43 C.F.R. § 4712.3–2(b).

That the Wild Horses' Act gives a great deal of discretion to the Secretary is clear from the legislative history of the Act:

It should be pointed out that the Secretaries of Interior and Agriculture are given a high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses and burros on the public lands. The Act provides the administrative tools for protection of the animals from depredation by man. This is the paramount responsibility with which the Secretaries are charged under the terms of the statute. 1971 U.S.Code Cong. & Admin. News, p. 2160.

Thus, defendants' contention is well-founded that BLM and its authorized officers have discretion to order and conduct a round up in Stone Cabin Valley. But the Court feels that the grant of discretion in the Wild Horses' Act is not so broad so that there is no law to apply in this case. The BLM does have discretion in determining whether an area is overpopulated, whether to reduce the population by removing excess wild horses, and whether to place those excess wild horses on public lands or in the custody of private individuals. The Secretary even has discretion to destroy wild horses when "in his judgment such action is necessary to preserve and maintain the habitat in a suitable condition for continued use." 16 U.S.C. § 1333(c). But apart from those discretionary powers, the Secretary must proceed with his decisions "under humane conditions and care" and "in the most humane manner possible." Clearly, the Secretary does not have discretion to choose an inhumane manner of capturing and distributing excess wild horses. Section 1333(a) of Title 16 provides a further mandatory duty: "The Secretary is . . . directed to protect and manage wild free-roaming horses and burros as components of the public lands." Therefore, despite the broad discretion given to the Secretary, the Wild Horses' Act does contain some law to apply: is the Stone Cabin Valley round up a violation of the Secretary's duty to protect wild horses? Is this round up being conducted under humane conditions and care and in the most humane manner possible? The Court finds that the discretionary function exception to judicial review under the APA does not apply here; since judicial review under the APA is available, 5 U.S.C. § 706 provides the standard of review to be applied to this BLM action.

As discussed above, the applicable standard of review for the claimed violations of the Wild Horses' Act is whether BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Defendants are clearly within the scope of their authority under the provisions of 16 U.S.C. § 1333 quoted above. On the affidavits and other matter submitted by both parties, this Court cannot conclude that the BLM round up decision is arbitrary and capricious.

The facts show that a seriously overgrazed range cannot continue to supply all of the needs for food placed on it by the various users: cattle, wild horses, and other wildlife. Wise range management techniques dictate that a given area must be restricted in use to those numbers that can be supported adequately and still allow the range to replenish its vegetation. The eventual result of an overused range is the complete destruction of that range, with so little vegetation that none of the users can survive on it. Consistent with the Secretary's duty to protect the wild horses, then, is management of the range in a manner designed to protect

the habitat of the wild horses. Stone Cabin Valley is endangered because of overgrazing; BLM's decision to remove less than one-half of the wild horses in the Valley to reduce grazing pressures is arguably in the best interests of the remaining wild horses. This Court cannot say that the decision was arbitrary or capricious or in violation of BLM's duty to protect wild horses.

In a similar manner, BLM's decision to use the water trap method to capture the wild horses cannot be deemed arbitrary or capricious or in violation of BLM's duty to conduct round ups in the most humane manner possible. As discussed above, defendant Berklund's affidavit claims that a round up by helicopter is the most humane manner, but this method is not possible, in view of 18 U.S.C. § 47. BLM has tried to accommodate various groups interested in the humane treatment of these horses; barbed wire is not being used, nor is the tranquilizer Sucostran. BLM has solicited the assistance of Wild Horse Annie's organization, WHOA!, and the National Wild Horse Association, and comments and suggestions from plaintiff have been considered by BLM officials. The Court finds that the round up is being conducted in the most humane manner possible, and that there is no violation of defendants' duties in this regard under the Wild Horses' Act. Plaintiff has not shown that this round up or any aspect of it constitutes a clear violation of the Wild Horses' Act which would enable this Court to conclude that plaintiff is likely to prevail on the merits of this contention.

■ *Violations of NEPA.* Plaintiff alleges that defendants should have filed an environmental impact statement (EIS) prior to making the decision to round up 400 wild horses in Stone Cabin Valley. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment . . ." 42 U.S.C. § 4332(2) (C). This requirement is mandatory, so judicial review of agency decisions under NEPA is available as provided in the APA, 5 U.S.C. § 706. The language quoted above from *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir. 1974), indicates that since NEPA is essentially a procedural statute, the courts should apply 5 U.S.C. § 706(2)(D) when reviewing agency decisions under NEPA. Under this standard, agency action should be set aside when found to be without observance of procedure required by law. The problem in this case is that there is no procedure required by law for BLM's decision *not* to file an EIS, against which its decision can be measured.[8]

BLM concluded in its Environmental Analysis Record that none of the proposed alternatives, including the round-

---

8. Under NEPA, federal agencies are required to "identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . ., which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B). Many agencies have issued regulations in accordance with this section which guide agency determinations of whether an EIS is required for a particular action. See, for example, regulations of the Atomic Energy Commission (now the Energy Research and Development Administration), 10 C.F.R. §§ 11.1–11.55; the Department of Defense, 37 C.F.R. §§ 214.1–214.10; the Federal Power Commission, 18 C.F.R. §§ 2.80–2.82; the Federal Trade Commission, 16 C.F.R. §§ 1.-81–1.85; and the Food and Drug Administration, 21 C.F.R. §§ 6.1–6.6. Neither party has cited, and this Court has not found any similar BLM regulations to guide this Court in determining whether BLM's decision not to file an EIS here is in accord with BLM procedures. Apparently, some guidelines were issued at one time by BLM, but these do not appear in the current C.F.R. See the reference to the BLM guidelines in *Natural Resources Defense Council, Inc., v. Morton,* 388 F.Supp. 829, 835 (D.C.D.C.1974) at fn. 10. That opinion did not rely on those guidelines. The guidelines of the Council on Environmental Quality discuss how to identify actions which require an EIS, but these are not binding on the BLM. See 40 C.F.R. §§ 1500.1–1500.14, especially § 1500.6.

up of wild horses, constituted major Federal action significantly affecting the quality of the human environment. Defendants did not specify whether they felt the action was not *major*, not *Federal*, not *significantly* affecting the environment, or not affecting the *human* environment. Since this Court finds that this round up of 400 horses in Stone Cabin Valley at this time will not have a *significant* effect on the Stone Cabin environment, an EIS was not required here;[9] the Court does not decide whether the round up fits any of the other § 4332(2)(C) elements.

The BLM's Environmental Analysis Record (EAR) identifies several components of the Stone Cabin Valley ecosystem, including aquatic and terrestrial plant life, animal life (including horses, livestock, and wildlife), and the landscape character. Removing the wild horses will also involve other elements of the Stone Cabin environment, including air quality, water supply, land use compatibility, and various human interests such as cultural, historical, educational, and scientific values.

The Court has determined that removing 400 wild horses from Stone Cabin Valley at this time will not have a significant effect on any of the elements of the environment mentioned above. The removal of the horses will temporarily stabilize the vegetation in the Valley.

The remaining horses, cattle, and other wildlife will have a slightly easier time finding adequate food. The air quality, water supply, and land use compatibility will be slightly improved. Since about 600 horses will remain in the Valley, the human cultural, historical, educational, and scientific interests will be preserved. Indeed, the interests which plaintiff has alleged to provide standing here will not be affected adversely in any significant way. At oral argument, plaintiff argued that its members have a protectable interest in knowing that the horses will remain on the public lands for their enjoyment, both for eyewitness observation and as elements of our national heritage, available for television documentaries and other public interest programs. (Transcript at pp. 4–5) The remaining horses in Stone Cabin Valley will satisfy these interests. This may have been a different case had plaintiff been able to satisfy the Court that the proposed round up would extinguish the wild horse population in Stone Cabin Valley.

The overall effect of this round up will be to stabilize the range temporarily; the effect on the Stone Cabin environment, if any, will be a slight improvement in the quality of the range. This will have a positive effect on the other elements of the area, including the remaining wild horses.[10],[11] This Court

---

9. An EIS has been ordered by Judge Flannery of the District Court for the District of Columbia which will encompass the Stone Cabin Valley. See *Natural Resources Defense Council, Inc., v. Morton*, 388 F.Supp. 829 (D.C.D.C.1974). Counsel in this case have indicated that the EIS for Judge Flannery will be submitted sometime in fiscal 1977. This Court assumes that a long-term solution to the overgrazing problem in Stone Cabin Valley will emerge from that EIS, taking into consideration the interests of the wild horse population in the Valley. The current round up is acknowledged by the BLM to be an interim measure to preserve the Valley pending a complete study and the development of a long-range solution designed to preserve the environment and reconcile the competing interests involved.

10. This Court is not saying that the BLM is free to round up wild horses whenever a particular range has an overgrazing problem. Nor is the Court saying that every time the removal of wild horses will have a limited, slightly positive effect on the environment of the range, the BLM can proceed to remove a certain number of those horses. BLM officials admit that more round-ups of wild horses may be necessary in the future. This Court decides only that the Stone Cabin Valley round up currently underway may continue as an interim measure to preserve the EIS required by Judge Flannery is filed in 1977. This Court presumes that future round ups will be undertaken only after the data contained in the

11. See note 11 on page 1220.

finds no violation of the procedures and requirements of NEPA in this BLM action.

*Allegations of abuse of discretion.* In analyzing plaintiff's contentions regarding arbitrary and capricious BLM action, apart from the alleged violations of the Wild Horses' Act discussed above, two major aspects of the BLM action are alleged to be arbitrary and capricious: (1) the decision that the land was overgrazed; and (2) the decision to resolve the overgrazing by rounding up wild horses, rather than removing cattle from the range.

■ The primary thrust of plaintiff's argument regarding the first aspect is that observations of the Stone Cabin Valley in June and July, 1975, show that the range is in good condition and not overgrazed. Plaintiff's expert, Dr. Kitchen, however, acknowledges that the range is in poor condition now as compared to fifty years ago, arguing that at this point, another year or two of grazing by the existing wild horses, cattle, and other wildlife will not have a substantial effect on the range. Defendants' experts argue that the range may look good to a layman after a favorable spring of precipitation, but that the overall condition remains extremely poor. Defendants' experts feel that immediate action is necessary to preserve the range. On the basis of these expert opinions that the range is in poor condition, this Court cannot say that the

BLM decision that the range was overgrazed and that some remedial action was necessary was arbitrary, capricious, or an abuse of BLM discretion.

Plaintiff's contention that the decision to solve the overgrazing problem by removing wild horses was arbitrary is based on the assertion that wild horses were given a higher priority on the public lands than other grazers under the Wild Horses' Act. The only statutory or regulatory support for this assertion is at 43 C.F.R. § 4712.1-4: "Closures to livestock grazing":

> The authorized officer may close public lands to use by all or a particular class of domestic livestock where he finds it necessary to allocate all available forage to, or to satisfy other biological requirements of, wild free-roaming horses or burros. Such closures may be made only after appropriate public notice and in accordance with the procedures for reduction or cancellation of grazing privileges provided for under the [regulations applying to the Taylor Grazing Act].

The Court does not read this regulation as giving wild horses an exalted status on the public range. The regulation would seem to apply to a situation where wild horses and burros were in danger of extinction; the remedy of restricting a public range for the sole use of one element of the ecosystem would seem to be a last-resort type of measure.

1977 EIS has been evaluated and all other alternative actions have been considered, as required by NEPA. In other words, this opinion should not be read as giving the BLM a blank check to order the removal of wild horses without filing an impact statement whenever it determines that a range is overgrazed. In this case, this Court has determined that the removal of 400 horses from Stone Cabin Valley at this time will not have a significant effect on the quality of the human environment in that Valley.

11. NEPA does not require the BLM *not* to employ proper range management techniques pending the ordered 1977 EIS; the BLM is not required to shut down all of its activities until then. Indeed, Judge Flannery's opinion

clearly contemplates continuing BLM operations before 1977. The test for what interim action will be allowed is simply that set out in NEPA: Is the proposed BLM action a major federal action significantly affecting the quality of the human environment? If so, an impact statement will be required even though similar factors will be considered in the ordered EIS. If not, as this Court has found here, no EIS will be required. This seems to be in accord with Judge Flannery's order. See footnote 21 of his opinion: "There is nothing, however, to support an argument that 'major individual actions' can proceed without a specific EIS while 'broad program statements' are under preparation." 388 F.Supp. at 840.

To so restrict the public range to one user would also violate the BLM's statutory mandate to administer the public lands under its control in accordance with the principles of multiple use and sustained yield of the several products and services obtainable on those lands. See 43 U.S.C. §§ 1411–1418. The regulations of the Wild Horses' Act expressly refer to the policies of this Act (the Classification and Multiple Use Act) as applying to wild horses. 43 C.F.R. § 4710.0–6.

■ This Court feels that the sounder view is that neither wild horses nor cattle possess any higher status than the other on the public lands. The regulations under the Classification and Multiple Use Act provide:

> *No overall priority is assigned* [by the Act] or by the Secretary *to any specific use.* The Secretary or his delegate will authorize under applicable authority, that use or combination of uses which will best achieve the objectives of multiple use, taking into consideration all pertinent factors, including, but not limited to, ecology, existing uses, and the relative values of the various resources in particular areas. 43 C.F.R. § 1725.3–1. (emphasis added)

These regulations do appear to contemplate the consideration of resources such as wild horses, even though promulgated before the passage of the Wild Horses' Act:

> Consistent with the provisions of applicable law, the land will be managed:
>
> \*   \*   \*   \*   \*   \*
>
> (c) To preserve important historic, cultural, and natural aspects of our national heritage. 43 C.F.R. § 1725.-3–2.

■ From these statutes and regulations, it appears that the public lands should be administered under the multiple use-sustained yield concept; management decisions should not be made after giving a priority to a particular user, but only after taking into account all of the various elements of the ecosystem involved.

Under the multiple use-sustained yield concept, then, the BLM had various alternatives available to them to alleviate the overgrazing on Stone Cabin Valley. The Wild Horses' Act gives the Secretary authority to remedy overgrazing by removing wild horses. 16 U.S.C. § 1333(b); 43 C.F.R. §§ 4712.3–2(a), 4712.3–2(b). Under the Taylor Grazing Act, 43 U.S.C. §§ 315–315o–1, the Secretary has the authority to restrict livestock grazing on overgrazed land within established grazing districts such as Stone Cabin Valley. 43 C.F.R. § 4115.-2–1(d)(5); 43 C.F.R. § 4125.1–1(i)(8). The decision to remove some of the wild horses is not so contrary to the statutory authority, or so out of line with the principles of multiple use and sustained yield, that this Court can find it to be arbitrary or capricious. Had the BLM decided to remove 400 cattle from the Valley, this Court would probably reach the same conclusion: that decision would not be arbitrary or capricious, requiring this Court to set it aside.[12]

■ *The Federal-State agreement to proceed with the round up.* Plaintiff's argument that the Federal-State agreement of September 3, 1975, is illegal is based on the theory that if the round up itself is illegal, the BLM cannot agree with the State of Nevada to implement an illegal act. Plaintiff also argues that the agreement represents an illegal delegation of Federal management responsibilities to State officials. Since this Court has found that the round up itself is not in violation of the Wild Horses' Act or NEPA, plaintiff's first point must be rejected. The

---

12. The Court notes that the cattle ranchers using the Stone Cabin Valley have voluntarily agreed to reduce the numbers of cattle using the range. This agreement is designed to lessen the pressures on the range vegetation by the same factor as the removal of 400 wild horses.

**1222**

invalid delegation argument must fail, also. Section 6 of the Wild Horses' Act, 16 U.S.C. § 1336, contemplates the type of agreement entered here:

> The Secretary is authorized to enter into cooperative agreements with other landowners and with the State and local governmental agencies and may issue such regulations as he deems necessary for the furtherance of the purposes of this chapter.

Counsel for the State of Nevada emphasized Nevada's interests in these horses. The round up of July 22–28, 1975, showed that many branded horses were being gathered. The State has authority over branded horses (branded horses are excluded from the definition of wild horses in the Wild Horses' Act, 16 U.S.C. § 1332(b)), keeping all records on brands at the State Department of Agriculture in Reno. Also, the State has an interest in seeing that the horses moved in interstate commerce meet the health certification requirements of a number of other states. The cooperative agreement permits the State to protect its interests in these horses. The Court finds that the Federal-State agreement of September 3, 1975, is the type of agreement contemplated by 16 U.S.C. § 1336, and that the BLM is not making an invalid delegation of its authority over wild horses to the State.

CONCLUSION

■ Plaintiff has not shown a sufficient likelihood of success on the merits of this action to justify the issuance of a preliminary injunction. Therefore, the round up of 400 wild horses in Stone Cabin Valley may continue, and the BLM may implement its planned distribution of captured wild horses to private individual applicants. Plaintiff's motion for a preliminary injunction is denied. Findings of fact and conclusions of law have been incorporated in the body of this memorandum as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.