AMERICAN HORSE PROTECTION AS-
SOC., INC., and the Humane Society of
the United States, Plaintiffs-Appellants,

v.

Cecil ANDRUS, Secretary of the Interior;
Frank Gregg, Director of BLM, George
Turcott, et al., Defendants-Appellees.

No. 78–3494.

United States Court of Appeals,
Ninth Circuit.

Nov. 23, 1979.

Russell J. Gaspar, Washington, D. C., argued for plaintiffs-appellants; David M. Barrett, McCandless & Barrett, Washington, D. C., on brief.

Carl Strass, Dept. of Justice, Washington, D. C., argued for defendants-appellees; Walter J. Postula, Land & Natural Resources, Washington, D. C., on brief.

Before MERRILL and WALLACE, Circuit Judges, and BARTELS,* District Judge.

MERRILL, Circuit Judge.

Appellants have taken this appeal from the order of the district court denying their motion to enjoin the Secretary of the Interior from removing wild horses from public lands in the state of Nevada. The district court order appears at 460 F.Supp. 880. Appellants contend that the Secretary's proposed action constitutes major federal action significantly affecting the quality of the human environment, and that under the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, an environmental impact statement (EIS) is required. No such statement has been prepared.

The Wild Horses and Burros Protection Act of 1971, 16 U.S.C. § 1331, provides:

"Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild, free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands."

The Act places, wild, free-roaming horses and burros under the jurisdiction of the Secretary of the Interior for the purpose of management and protection. 16 U.S.C. § 1333(a).

The Act, 16 U.S.C. § 1333(b)(2), provides:

"Where the Secretary determines on the basis of (i) the current inventory of lands within his jurisdiction; (ii) information contained in any land use planning completed pursuant to section 1712 of Title 43; (iii) information contained in court ordered environmental impact statements as defined in section 1901 of Title 43; and (iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i–iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels."

The Secretary has announced plans to reduce the number of wild horses on the public lands of Nevada in order to improve the condition of the range. It is planned that six wild-horse roundups will be conducted in order to remove approximately 3,500 wild free-roaming horses from federal

* Honorable John R. Bartels, Senior United States District Judge of the Eastern District of New York, sitting by designation.

public lands in Nevada. It is intended that the roundups will reduce the wild-horse population to a level at which it will be permanently maintained. Maintenance of the horse population at the contemplated level will require the removal of approximately 7,000 horses each year. For each roundup, a wild-horse management plan has been prepared, as has an environmental analysis record (EAR), setting forth the anticipated environmental impact of the management plan and possible alternatives to the plan. On the basis of the EARs the Secretary has concluded that EISs, pursuant to NEPA, are not required.

Appellants contend that the annual removal of 3,500 to 7,000 wild horses from the federal public lands of Nevada amounts to major federal action, significantly affecting the quality of the human environment, and that under the provisions of NEPA, 42 U.S.C. § 4332(2)(C), EISs are required. They contend that there is no administrative or judicial discretion to dispense with such statements.

The court below declined to enjoin the roundups or to require preparation of environmental impact statements. It apparently concluded that requiring the preparation of EISs in this case would interfere with the continuing jurisdiction of the District of Columbia court in *Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829 (D.D.C.1974), *aff'd,* 174 U.S.App.D.C. 77, 527 F.2d 1386 (D.C.Cir.), *cert. denied,* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). The trial court refers to the *Natural Resources Defense Council* court as "[t]hat court which has jurisdiction of BLM's compliance with NEPA throughout the public land states." 460 F.Supp. at 884. In response to plaintiffs' contention that the Bureau could not reasonably decide that EISs were not required, the court below states: "Here, again, the *Natural Resources Defense Council* case, *supra,* has usurped the field. Assuming an EIS is required in one or more of our problem areas, it is not due until the judgment of the District of Columbia court says it is due." 460 F.Supp. at 885.

We disagree. In our opinion, the trial court accords too great scope to the jurisdiction of the District of Columbia court. *Natural Resources Defense Council, supra,* involved the Bureau's livestock grazing program, under which it issues permits allowing ranchers to graze their stock on public lands. At issue was whether NEPA applied to the licensing program and, if it did, what compliance with NEPA required. For management purposes, the grazing lands are divided into 52 grazing districts, each of which in turn is divided into planning units. 388 F.Supp. at 832. The Bureau had prepared a programmatic EIS for its entire livestock grazing program which provided a general outline of relevant environmental effects. *Id.* The court held that NEPA did apply, 388 F.Supp. at 834, and that the programmatic EIS did not suffice, since it did not sufficiently inform the individual district managers, who had the responsibility for approving applications for grazing permits, as to the environmental factors likely to bear on their individual actions in any particular case. 388 F.Supp. at 838–39. More specific EISs were ordered.

We find no indication in *Natural Resources Defense Council* that the court intended to assert jurisdiction over all NEPA questions involving the public rangelands. The decisions involved in that case as to the propriety of issuing grazing permits are not the same as the decisions in this case regarding the extent to which the wild horses are to be removed or the level at which their population is to be maintained. While the EISs being prepared pursuant to *Natural Resources Defense Council* must give some consideration to the horses as competing users of the range, the focus of those EISs is quite different from what the focus of EISs in this case would be. We thus have no assurance that the EISs prepared in *Natural Resources Defense Council* will adequately inform the Secretary as to the extent to which the horse population in Nevada should be reduced or the level at which it should be maintained.

Further, we see no conflict between the preparation of EISs in this case and the preparation of the EISs in *Natural Resources Defense Council*. The most that will be required is that the two groups of decisionmakers gathering data consult with each other or co-ordinate their efforts. There is nothing to prevent the Secretary from providing for such co-ordination. Judicial concern at this stage of the proceedings is only that the decisionmaker be adequately informed before making his decision; the mechanics of that informational process are for the Secretary, not the courts, to determine.[1] Similarly, the exercise of jurisdiction by both courts creates no threat of conflicting decisions dealing with range utilization because those decisions will be made by the Secretary, not the courts; the courts' only concern is to assure that the ultimate decision of the Secretary be an informed one.

We conclude that the District of Columbia court did not occupy the field of range management to the exclusion of the court below. The district court, then, must reach and decide the question whether the proposed roundups and removals constitute major federal action significantly affecting the quality of the human environment.

▮ The Secretary contends that removal of the horses is not major federal action significantly affecting the quality of the human environment because the only environmental effect would be beneficial, the action being taken for the purpose of improving the rangeland. However, the environmental impact is not solely on the rangelands, but on the horses as well. By congressional finding, as we have noted, wild free-roaming horses "contribute to the diversity of life forms within the Nation and enrich the lives of the American people,"

and "are to be considered * * * as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. It cannot be denied that removal of a substantial number of wild horses will affect the quality of the human environment as that quality is viewed by Congress. The question is whether it will *significantly* do so.

One statement of the trial court bears on the question whether the effect on the quality of the human environment would be significant. The court states:

"Further, one of the areas involved in this case, the Stone Cabin area, was before Judge Roger D. Foley in *American Horse Protection Ass'n Inc. v. Frizzell*, 403 F.Supp. 1206 (D.Nev.1975). There it was held directly that a round-up of 400 wild horses to ease pressure on the range was not action requiring an EIS because the round-up would not have a significant effect on the environment. The round-ups contemplated here are not different in kind."

460 F.Supp. at 885.

Without prejudging the question of significance (with which, upon remand, the district court must deal), we would point out that the roundup in *Frizzell* was of 400 horses rather than 3,500 to 7,000, and was interim action. The *Frizzell* court stated:

"The current roundup is acknowledged by the BLM to be an interim measure to preserve the Valley pending a complete study and the development of a long-range solution designed to preserve the environment and reconcile the competing interests involved."

403 F.Supp. at 1219 n. 9.

▮ While interim action involving removal of horses for the protection of the range pending issuance of an EIS may be felt to be insignificant or not "major," it

---

1. The appropriate geographic area to be covered by each EIS is also a matter for the Secretary's discretion. As the District of Columbia court in *Natural Resources Defense Council* stated:

"It will be initially within the BLM's discretion to determine whether to make this specific assessment in a separate impact statement for each district, or several impact statements for each district, or one impact statement for several districts or portions thereof, or indeed by any other means. So long as the actual environmental effects of particular permits or groups of permits in specific areas are assessed, questions of format are to be left to defendants."

388 F.Supp. at 841.

would not follow that the ultimate decision to remove horses in order to maintain the horse population at a permanent level would be equally insignificant.

Further, at one point the court states:

"The Environmental Analysis Records prepared for each of the six subject areas (in varying degrees of completion) are quite adequate to support the discretionary decision to remove some of the horses."

460 F.Supp. at 885. But this misses the point. The Secretary has no discretion regarding compliance with NEPA; the requirement that an EIS be prepared for all major federal action significantly affecting the quality of the human environment is mandatory. *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1248–49 (10th Cir. 1973); *American Horse Protection Ass'n v. Frizzell,* 403 F.Supp. 1206, 1218 (D.Nev.1975).[2]

We conclude that the district court must reach and decide the question whether the proposed action of the Secretary in rounding up and removing wild horses from federal public land in Nevada is such action as requires the preparation of an EIS.

Appellants also sought an injunction prohibiting the continuance of certain practices of the appellees at the Palomino Valley holding facility. The court did prohibit destruction of horses or burros at the holding corrals save in a specific manner and under specific circumstances. 460 F.Supp. at 888. As to the remaining practices of which the appellants complain, the court found that appellees had taken steps to remedy the substandard situation that had existed there and that it was unlikely that such conditions would recur. These findings are not clearly erroneous and denial of a temporary injunction on these facts was proper.

The order of the district court denying appellants' motion to enjoin the roundups is vacated. The case is remanded for further proceedings. The stay which was granted by this court is vacated without prejudice to the right of appellants to seek temporary relief from the district court.

That portion of the district court's decision which deals with the practices of appellees at the Palomino Valley holding corrals is affirmed.

**2.** Appellants contend that even if the Secretary had fully complied with NEPA and had based his decision on adequate EISs, or if EISs were not required, the Secretary's decision to remove the 3,500 or 7,000 horses would still be an abuse of discretion under the Wild Horses and Burros Protection Act of 1971, 16 U.S.C. § 1331 *et seq.* Appellees contend that the Secretary's discretion in this regard is absolute.

This issue is discussed in *American Horse Protection Ass'n v. Frizzell,* 403 F.Supp. 1206, 1216–18 (D.Nev.1975).

It would be inappropriate for us to reach the question of the Secretary's discretion at this time as the trial court has not yet squarely considered the issue independently of the requirements of NEPA.